## Ashhurst's Appeal—Estate of the Montour Iron Company.

1. A sale by directors of the property of an insolvent corporation to hinder, &c., creditors, would not make the purchasers trustees for the corporation or its stockholders. Creditors could have avoided it.

2. A sale was made to certain creditors of a corporation. If it was for a fair price and to procure the means of paying debts, and especially if its proceeds were applied to their payment or security, other creditors could not have avoided it.

3. As a general rule directors of a company have no right to do an act foreign to the purposes of its creation.

4. Though the law ordinarily frowns upon contracts made by directors of a corporation with themselves as private persons, such contracts are not necessarily void; but their fairness must be shown.

5. Such sales are supported in equity where the fiduciary relation has ceased before the purchase, where it was made with consent of the stockholders, or where they have by acquiescence debarred themselves.

6. An attempt to fasten *a constructive trust* on a purchaser must fail unless made within a reasonable time.

7. Acquiescence is presumed from delay.

8. If a trustee to sell becomes the purchaser, the purchase is generally voidable, but the *cestui que trust* must move in a reasonable time.

9. When a party claims to hold another as trustee for personal property under a constructive trust, he must assert his claim within six years from the time when it is alleged to have originated.

10. There may be cases where six years would not be allowed, as where the party stands by and sees another dealing with the trust property in a manner inconsistent with any trust, and makes no objection: or where rights of third parties have intervened: or where the property is of a peculiar kind, and the alleged trustee in ignorance of an intention to hold him to account relying on his ownership, enters on a hazardous business or incurs responsibilities.

11. Laches for less than six years, aided by other circumstances, will bar a right.

12. The character of an instrument is not to be determined by what the parties have called it.

13. Instruments alleged to be assignment for benefit of creditors, construed.

January 15th and 16th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Court at Nisi Prius: No. 38, to January Term 1865. In Equity.

The bill was filed, January 12th 1865, by Lewis R. Ashhurst and William H. Ashhurst, for themselves and all other stockholders of the Montour Iron Company who may choose to become parties, &c., against Isaac S. Waterman, Thomas Beaver, John A. Lewis, The Pennsylvania Iron Company, The Montour Iron Company, Thomas Chambers, John Grove, administrator, &c., of John P. Grove, and others. Service of the subpœna was accepted for Waterman, Beaver, Lewis, and the Pennsylvania Iron Company, and returned "*nihil*" as to the others.

The bill set out: The incorporation of the Montour Iron Company, in December 1844, for the purpose of making iron with coke or mineral coal. The capital stock consisted of 9000 shares of $50 each; afterwards increased to 18,000 shares. The plaintiffs held 3328 shares. The company organized and erected the necessary works. Shortly after the increase of capital they issued bonds to the amount of $600,000, with interest payable semiannually, secured by mortgage to trustees on their real estate, dated September 28th 1855. Many of the bonds were sold or pledged, thus becoming debts against the company. By the mortgage the company covenanted to pay annually to the trustees $28,000 for a sinking fund, and in case of failure to pay the interest for thirty days and notice, the principal after thirty days more should become due, and the trustees might proceed to bring about a judicial sale. Up to the 27th of September 1857 the debts of the company, in addition to the mortgage, amounted to many hundred thousand dollars, and so embarrassed the company as to threaten its existence. The stock was then held by the complainants, and by other persons than Chambers, the Groves and Henry M. Fuller. The stockholders relied on the officers of the company to attend to the interest of the company; "and if all stockholders had notice of meetings held on September 15th, 17th and 19th 1857, hereafter referred to, and of the very important business to be transacted thereat, which complainants do not admit, they must have had unusual reliance on their officers to have been absent," &c. The minutes of the company show that at a meeting of the stockholders on September 15th 1857, in pursuance of notice, "present Thomas Chambers, Henry M. Fuller, John P. Grove and John Tucker, representing more than two-thirds of the entire stock," the president of the company submitted the balance-sheet and other statements, and his judgment that the works must stop, and could not be conducted on the receipts. After discussion the meeting adjourned until the 17th then instant. At the meeting on the 17th, at the company's office in Philadelphia, present Fuller and J. P. Grove, the meeting was adjourned to the 19th. On the 19th, present Chambers, Fuller, J. P. Grove and T. M. Bryan, it was resolved that the directors be instructed forthwith to execute bills of sale of the

personal property of the company to Chambers, Fuller and the Groves for $304.951.66, for their notes, on terms and at times to be agreed on, and to lease to the same persons for five years the real estate and works at a rent of $40,000, on such other terms as the directors may deem advisable.

The plaintiffs required proof that the meetings were regularly called, and alleged that the absence of other stockholders, &c., "create great doubts whether all persons interested had notice;" and that the resolutions of September 19th, and all done in pursuance of them, were void. Bryan is a son-in-law of Chambers, and did not in his own right own any stock, but held in his name stock belonging to Chambers to enable him to vote. The stock in the name of Tucker belonged to the company or Chambers. The only real stockholders at the meeting were Chambers, Fuller and the Groves, and therefore Chambers, Fuller and Grove, as stockholders, directed themselves as directors to assign and lease to themselves all the property of the company upon terms to be agreed upon with themselves. The minutes further show that at an adjourned meeting of the directors " duly convened," Chambers, Fuller, Bryan and J. P. Grove being present, the president was directed to execute the lease and bill of sale of the personal property to Chambers, Fuller and the Groves, and to cause the real estate and "personal property sold them, as specified in an inventory appended to the bill of sale," to be paid for by their notes, viz., $265,000 on demand, and the remainder at three, six, nine and twelve months.

At the same meeting the directors resolved that the rent due on the lease be assigned to a trustee to pay interest on the bonds, insurance, sinking fund "and such other provisions" as the president may deem advisable. At a meeting of the directors, September 26th 1857, the president reported that the personal property had been delivered to the lessees and that he had received from them the demand note of $265,000, and four other notes for $9987.91 each, at three, six, nine and twelve months respectively, all dated September 19th 1867, and amounting in the whole to $304,951.66; the president also submitted an assignment of the rent to John A. Lewis, as trustee for the purposes before mentioned, also assignments of ore lease and other property to Chambers, Fuller and the Groves. At a meeting of the directors, September 28th, they resolved that the note of $265,000 should be given to P. Choteau & Co. in lieu of their claim secured by bond and mortgage, two of the other notes to the Bank of Danville in part payment of notes of the company amounting to $20,000, the other notes to Ely & Co. and Barcroft & Co., in settlement of their respective acceptances; the papers were all executed by Chambers as president of the company. Copies of the lease, &c., were attached to the bill.

The plaintiffs averred that the instruments were voidable by the creditors and the stockholders; because, 1. The consideration had no existence: Chambers & Co., it appears by the minutes of a meeting of February 26th 1858, never intended to pay the notes for $9987.91 and the note for $265,000 has not been paid; the minutes treat the notes and the transfers such as the company might cancel at pleasure, thus revesting the property in the company. 2. The design was to transfer all the property of an insolvent company by the president and directors to themselves without the assent of the stockholders. 3. If the stockholders' meeting of September 19th was a lawful meeting it authorized only the sale and lease to raise money to pay the debts, and the instruments executed being for a different purpose were void. 4. The design of the papers was to delay, hinder and defraud creditors. 5. The assignment of the rent to J. A. Lewis was unauthorized by the stockholders. Chambers & Co. being unable to enter upon the manufacture of iron, obtained a charter for a company called the Montour Ironworks Company; they were the only real subscribers but no certificates of stock were issued and the company did not organize for any substantial purpose; the lease, personal property, &c., transferred to Chambers & Co. were by them, on the 13th of November 1857, transferred to the Montour Ironworks Company. The minutes of the directors of the Montour Iron Company show the approval by the directors of the assignment by Chambers & Co. to the Montour Ironworks Company of the lease of September 19th, and a release of Chambers & Co. from all liability; also instructions to the president to assign to the Ironworks Company a lease from P. Maus to the Ironworks Company, provided the Iron Company be indemnified from all liability and loss, &c.

The creditors of the Iron Company becoming urgent, on the 26th of December 1857 an agreement was entered into between Groves, Fuller and Chambers of the first part, the Montour Iron Company of the second part, certain creditors signing the agreement of the third part, Isaac S. Waterman, Thomas Beaver, Jacob V. L. De Witt, Washington Lee, Jr., and three others, trustees on behalf of said creditors, of the fourth part and the Montour Ironworks Company of the fifth part. The agreement recited the indebtedness of the first party on account of the Montour Iron Company and the creditors' desire to effect a settlement of the business and a liquidation of the debts, and the first party's willingness to make the arrangement proposed by the creditors:—
1. The first party bound themselves to assign to Waterman, Beaver and others, trustees of the fourth party, upon terms set out in the agreement, the lease of September 19th, with this stipulation: "It is hereby intended to embrace all the property, benefits and privileges, subject to all the conditions contained in

[Ashhurst's Appeal.]

the said lease and transfer, and the same shall be assumed and performed by them," the fourth party. 2. The first party further bound themselves to assign, &c., to the fourth party all the personal property, &c., sold them by the bill of sale of September 19th. 3. The first party further bound themselves to assign, &c., to the fourth party all the bonds, stocks and evidences of indebtedness transferred to them by the Montour Iron Company. 4. The fourth party to take the property transferred subject to pledges as to a portion of it. 5 and 6. T. K. Groves bound himself to convey to the fourth party a farm called "The Blue Farm," and other real estate, they to pay the unpaid purchase-money and save Grove harmless. 7. The first party bound themselves to convey to the fourth party certain limestone and ore leases. 8, 9 and 10. The first party bound themselves to transfer to the fourth party, if requested, all the stock in the Montour Ironworks Company, 10,126 shares of the stock of the Montour Iron Company and all the property and effects and the proceeds thereof received from the latter company. 11. In consideration the third party (the creditors) agreed to release the first party from all their claims, these claims being set out in schedules from A. to K. 12. The creditors named in schedules from A. to K. not to " be required to sign this paper in order to make it go into effect, but it shall be a sufficient compliance with this agreement when it is signed by all the creditors, who it may be agreed are not secured in full for their debts, or when the parties of the first part are protected and indemnified from and against the claims of all such creditors as may not have signed this agreement, who it is agreed have not already security in full for their debts; and it is further understood and agreed that the signatures of any creditors who may hold security in whole or in part for their debts, shall not be construed or taken to impair, prejudice or affect in any manner their rights to hold such security or securities in the same manner and with all the power they now have in reference thereto.

" 13. So soon as this agreement has been signed by all the creditors holding the debts set out in schedules A. to K. inclusive, who it is agreed have not security in full for their claims, or so soon as protection and indemnity or releases have been provided in favor of the said parties of the first part, and the firms of which they are members, from and against all the debts or claims set out in said last-mentioned schedules, the holders of which it is agreed are not secured in full already, and refuse to sign this paper, and it is signed by all the other parties hereto, it shall go into effect, and all the transfers, assignments and deliveries hereinbefore provided for, are forthwith to be made by the parties of the first part, and upon the parties of the first part complying with their agreements and undertakings hereinbefore contained, the releases to the parties of the first part and to the firms of which they are members

hereinbefore provided for, shall immediately take effect and be delivered to them."

14. The fourth party to have power to arrange with any creditor in the schedules mentioned, who may refuse to sign the agreement, so as to release the first party; or to arrange so as to protect the first party from claims of such creditors, and for that purpose may pledge any property, &c., received under this agreement, to make contracts and bind the property, &c., "in order to procure any such release, protection or indemnity." 15. If the agreement be not signed by the parties whose signatures are required, or proper releases, &c., for the first party be not obtained within fifteen days, it shall be void; but the first and fourth parties may extend the time, &c. 16. E. H. Baldy, Esq., to decide what creditors are not required to sign the agreement; what creditors have not security in full; what protection, &c., are to be provided for the first party; and upon his decision that the protection, &c., have been provided, the agreement shall take effect. 17. The Montour Iron Company declared that the debts in the above schedules had been contracted on their account; that the agreement was made with their approbation; and that they agreed to remain bound for those debts. 18. The Montour Ironworks Company gave their assent, and bound themselves to do what might be necessary to enable the first party to fulfil their part of the agreement. 19. The first party will not collect any claims they have against the Montour Iron Company for five years, unless the whole amount of the claims in said schedules A. to K. are sooner paid; and if any dividend shall accrue to them by reason of any such debts before the said claims are paid, they will forthwith direct the same to be paid to the fourth party, to be applied in the same manner as the property, &c., transferred to the fourth party are to be applied. But when the claims due to the said creditors are discharged, then the first party shall have power to collect their said claims against the Montour Iron Company.

This article is intended to apply especially to the following debts of the Montour Iron Company:—

Claim of Henry M. Fuller, . . . . $75,953.95
Order in favor of same for coupon bonds drawn by
　　J. P. & J. Grove, agents, on Thomas Chambers,
　　president, for . . . . . . . 10,500.00
Claim of Comly, Grove & Co. for . . . 90,278.04
Claim of Fuller, Grove & Co.

It being intended hereby to give to the creditors, and to the fourth party representing them, a preference over the first party as regards their claims against the Montour Iron Company.

Any *payments* or *dividends* which may accrue to the fourth

party shall not reduce the claims above set out; but after five years, or when the debts due the creditors, party of the third part, have been fully paid, with the expenses of this trust, the holders of the above claims against the Montour Iron Company may collect the whole amount thereof as though no payment had been made thereon.

20. All the property, &c., to be transferred to the fourth party, are to be taken, &c., in trust for the creditors, who hold the claims set out in schedules A. to K.

21 and 22. The fourth party to have absolute discretion in the management of the property; to use it for the manufacture and sale of iron, or selling goods as the two companies had done; but to make no contracts to bind the signing creditors, but only the trust property, and with the consent of a majority of creditors in interest, they may put the property, &c., into a new company, and take stock in lieu thereof, and divide the stock *pro ratâ* amongst the creditors. 23. The fourth party to be liable only for intentional fraud; a vacancy to be supplied by a majority of the creditors in interest. 24. The agreement not to be held an assignment for the benefit of creditors under the laws of Pennsylvania; and, if it should be so construed by any court, the parties having received any dividend, &c., bind themselves to surrender so much as may be necessary to protect the trustees for any act which they may have done. 25. The Montour Iron Company shall allow the fourth party to have the lease at a nominal rent of not more than $50 per annum. Amongst the creditors who signed the agreement were Waterman, Beaver, Dewitt and Lee, four of the trustees.

On the 5th of February 1858, an agreement was made between Waterman, Beaver and three others, being five of the trustees of the one part, and the Groves, Fuller and Chambers of the other part; it recited the agreement of December 26th, and that in pursuance thereof, by agreement dated February 3d 1858, the trustees undertook to pay Choteau & Co. the debt due them at 50 per cent., in railroad iron at $50 per ton; that it was expected that certain other debts mentioned in the schedules would have to be paid from assets coming to the hands of the trustees; that it was contemplated that the trustees would at a future time convert the assets into stock in a corporation thereafter to be created; that the trustees should have full authority to provide for such debts mentioned in the schedule as might be held by persons who had not signed the agreement; that the trustees could not arrange for the settlement of the debt of Choteau & Co., nor the possession of the property, &c., unless by an arrangement with Chambers & Co., the second party to this agreement, whose assistance is necessary for the management of the property, and the best interests of all parties concerned in the trust. The agreement therefore

[Ashhurst's Appeal.]

stipulated:—1. That Chambers & Co. had at the date of this agreement delivered to the trustees the property mentioned in the agreement of December 26th; 2. That the trustees should convert the property, &c., into the stock of an incorporated company; 3. That the trustees have power in their discretion to make provision for the debts mentioned in the schedules and pledge, or otherwise use the property, &c., and the stock they might take in the corporation; 4. The stock to be received by the trustees to be of the value at par of $600,000, to be appropriated as follows: $210,000 for the trustees and the holders of debts mentioned in the schedules, who had signed the agreement of December 26th; $210,000 to Chambers & Co. for the consideration before mentioned, and the remainder for the benefit of all parties interested—it being the stock that is to be sold, &c., for the debts mentioned in article 3. If found not advisable to have a company with a capital so large as $600,000, then, the parties may agree on a less amount, and the interests of the parties above named are to be in proportion to the reduced capital.   5. No stock to be issued to Chambers & Co. until the trustees have settled all the debts against them set out in the agreement of December 26th, and the schedules, whose holders have not signed the agreement; nor until Choteau's debt shall have been settled as above agreed on; nor until the creditors who signed the agreement shall have received 50 per cent. of their claims in railroad iron at $50 per ton.   After these stipulations have been complied with, Chambers & Co. to have their stock and vote on it.   No dividend or payment to be made to any creditor who signed the agreement of December 26th out of the property, &c., transferred, until releases and indemnities be given to Chambers & Co.   " This agreement is not intended in any manner to alter, affect or prejudice the rights or interests of any of the creditors under the provisions of the agreement of the 26th day of December 1857 ; but it is adopted as the only means whereby the objects and purposes of said agreement can be accomplished and carried out."   This agreement was signed by all the parties to it.

At a meeting of the directors on the 26th of February 1858, at which Chambers, J. P. Grove, Fuller and Bryan were present, the agreement of December 26th 1857, and the assignments of the limestone and ore leases were ratified; it was also resolved, that the four notes of Chambers & Co., for $9987.91 (their acceptance having been refused by the persons to whose debts they had been appropriated), be cancelled, the property for which they had been given be transferred to the trustees under the agreement of December 26th, who are to account to the company for $39,951.66 ; that in consideration of the debts and liabilities assumed by the creditors and trustees, the lease be assigned to the trustees at $50 rent.   The plaintiffs aver that the acts of the trustees of the Iron

Company referred to in the minutes of the meeting of February 26th, were invalid and voidable; because, 1. They were subversive of the whole business of the company, and had not the authority of the stockholders; 2. The rent could not be released, having been transferred to Lewis in trust; 3. The agreement of December 26th was not recorded in thirty days; 4. They were the acts of Chambers, Fuller & Grove merely; they using their official character fraudulently for their own benefit, and against the interests of the company. Notwithstanding this invalidity the defendants are estopped from disputing the agreement, because the trustees got a benefit by the reduction of the rent. They further aver, that the trustees under the agreement were assignees for the benefit of creditors of the Montour Iron Company, and as it was not avoided there was a resulting trust after payment of the debts for the stockholders; that Waterman and Beaver, and the other trustees, had notice of the facts rendering the agreement and other transfers voidable, of the insolvency of the Montour Iron Company, and that Chambers, Fuller and Grove were officers of the company, and were unable to pay, and had not paid the consideration in the assignments and lease; that the Montour Ironworks Company had not gone into operation; that the rent of $40,000 had been assigned to Lewis; that the bonds and mortgage were in existence; that they were affected with knowledge of the minutes of the directors and stockholders, and with all that was known by Chambers, Fuller, Groves and the Montour Iron Company, and were not purchasers for value without notice. They further averred, that the agreement of February 5th was void against the Montour Iron Company and its stockholders, they not being a party to it, and deprived the trustees of all equity as purchasers. The trustees carried on the works, used the old material, bought new, settled debts, received collaterals which the creditors had held, and in other ways disposed of the trust property. They averred on belief, that all or nearly all the scheduled debts had been paid, and they are advised that the trustees can be compelled to account as trustees for any surplus which has resulted, or would have resulted if all they had done for their own benefit and that of those not entitled to benefit had been done for the trust, including transactions thereafter set forth in the bill. The lease transferred under the agreement of December 26th was the most valuable part of the Iron Company's property. It was the duty of the trustees to protect the property against accruing interest under the mortgage; as the property was liable to be sold in case the interest should be in arrear, and to apply funds in their hands to its payment before paying the other debts. The Iron Company had covenanted to pay interest and establish a sinking fund by an annual payment of $28,000; and had assigned the rent under the lease to J. A. Lewis, to pay the interest and the annual sum to

the sinking fund. The company, by the agreement of December 26th, agreed to reduce the rent to a nominal sum, without the consent of Lewis or the bondholders; and the trustees took the lease burdened with the trusts in the assignment to Lewis. The trustees planned to become the owners in their own right of the works, &c. The interest on the bonds having accumulated, the trustees in the mortgage received notice to bring about a sale under it, and filed several bills for this purpose in the Supreme Court, asking for a decree of sale. The trustees under the agreement opposed the decree, their plans for procuring the works not being mature, and they preparing for a sale when it could be made for their individual benefit; they had acquired $120,000 of the bonds which had been held as collateral by creditors with whom they had settled; they purchased bonds from the holders of the rest to be paid from bonds to be secured on the premises after they should be purchased at a sale under the mortgage. On the 30th of September 1860, the premises were sold under the mortgage, and purchased for $100,000 by J. A. Clay, Esq., who had been employed for that purpose by Waterman and Beaver; part of the purchase-money was paid, and the remainder never paid, but included in a final settlement with the mortgage trustees. The conveyance was made to Clay, and he at once conveyed to the Pennsylvania Iron Company incorporated for the purpose, in which most if not all of the stock was owned by Waterman and Beaver; and a mortgage was given by that company for $400,000, in lieu of the discharged bonds of the Montour Iron Company. The trustees under the agreement then alleged that they had administered all the property under their trust; that the Pennsylvania Company held the property unaffected by the trust; and that the trust estate created by the agreement was divested by the sale under the mortgage. The Pennsylvania Company have since been carrying on the works at a large profit. Plaintiffs aver the purchase by Mr. Clay was and is for the trust under the agreement; and that the title to the real estate, ironworks and ore property—the debts of the Montour Iron Company being paid—remained in the Montour Iron Company. There has been no meeting of that company or election of officers since 1860; the stockholders have acted as if the franchises had been abandoned; there were therefore no officers who can be called on to assert the rights of the stockholders; and the interest of Chambers, the only remaining officer, is adverse to the plaintiff's claim. The plaintiffs averred, that it was a case in which no action can be procured in the name of the company, and the stockholders must intervene for their own protection; that Waterman and Beaver had given no account of their administration of the trust; that there was in their hands a resulting surplus of the estate of the Montour Iron Company assigned to them, which is

[Ashhurst's Appeal.]

to be distributed amongst the stockholders; that the real estate should be conveyed to said company by the Pennsylvania Company, and they should be compelled to account for the profits they have made, and, if necessary, the court should decree another organization of the Montour Iron Company. They attached twenty-four interrogatories. The prayers were, that the trustees (defendants) should give an account of their administration of the trust, and all their acting under the agreement; and of their dealings in respect to the bonds of the Montour Iron Company; that the Pennsylvania Company should give an account of their management of the real estate, &c., since they acquired title, and be enjoined from making sale, transfer, &c., of any part thereof; for a decree of reorganization of the Montour Iron Company, and for the transfer to them by the Pennsylvania Company of the real estate, &c., and that a receiver may be appointed, &c., and that the bonds acquired by Waterman and Beaver were acquired for the Montour Iron Company, that the purchase by Clay was for that company; and for further relief.

Waterman and Beaver pleaded as to the agreements of December 26th 1857 and February 5th 1858, and their dealings with the bonds secured by the mortgage and the claim to the real estate, that more than six years before filing the bill they purchased, for value without notice of trust or other equity, the property, leasehold, &c., from Chambers & Co., who claimed and were in possession of them; and the defendants took possession of the property, &c., more than six years before filing the bill, and since have notoriously claimed the ownership; that the property has since been held for themselves, Fuller, the Groves and no others, until October 1860, when they purchased the rights of other parties interested, the sale under the mortgage having vested in them solely for their own use the real estate discharged of the lease and all liens; and the purchase did not profess to be made for the plaintiffs, the company or its stockholders; that certain of the bonds were purchased with defendants' own funds, and others were acquired in the administration of the trust, and were purchased by them as the rest of the assets; that the land was purchased in · part with these bonds, and in part with money and property of their own, and no one had any interest in them but those interested under the agreements of December and February. The defendants pleaded the Statute of Limitations.

The said defendants answered, denying that the sale to Chambers & Co. in September 1857, although it may have been voidable, was void; they averred that the consideration to the extent of $265,000 was paid by Chambers & Co., by giving their note for that amount to a creditor who has sued on it; that the property they sold would not have brought that amount in the market; that the lease was of no value, as it was liable to be ter-

minated by a sale under the mortgage; that no one then would have set aside the sale, the company owed $1,400,000 beside the mortgage, the real estate would not pay 60 per cent. of the mortgage-debt; if the sale had been avoided the assets would have been squandered at sheriff's sale; the purchasers gave more than their value for them, and proposed to sell them in satisfaction of their liabilities as sureties of the company; that the defendants when they purchased would know that the company must avoid the sale in a reasonable time; that neither the company nor the stockholders ever elected to avoid the sale, nor have the plaintiffs pretended to such right until the filing of their bill; that they believe the plaintiffs had actual notice of the sale, certainly constructive notice by the minutes, the possession of the defendants, their open dealing with the property, &c., that plaintiffs were partners with their father R. Ashhurst, who held some of the company's bonds and was applied to through a brother John, another partner, in case of a sale to exchange for the new company's bonds. The plaintiffs were partners with John, who was a trustee under the mortgage, and was active in bringing about the sale and conveyance to the defendants, and they well knew that the defendants contemplated becoming purchasers at the sale, and of their arrangements for payment, but stood by and acquiesced in the sale; that defendants made application without success to holders of bonds, including John Ashhurst, to unite with them in the purchase, and were compelled to make it alone; the deed was absolute without pretence of trust, and was executed by John in January 1861, the defendants have since occupied the real and personal property without any suggestion of a right in the complainants; that allowing the defendants to continue in possession without demanding an account, and allowing the Montour Iron Company to expire without taking steps to maintain its organization, was a waiver by plaintiffs to set up any right as stockholders; defendants insisted on the facts that they had been permitted to carry on the business at great risk and expense during a number of years of financial embarrassment, and to buy out the interests, &c., to make improvements at a cost of above $300,000, to surrender their bonds to the company, pay creditors, &c., &c., as being conclusive, after such a lapse of time, against the plaintiffs; that the sale to Chambers & Co. was authorized by the stockholders, of whose meetings the plaintiffs do not deny notice; no other stockholder has sought to set the sale aside; they denied that the sale was intended to delay creditors, but this would be immaterial, as no creditor complains; they denied notice, actual or constructive, of the assignment of the rent to Lewis, but they bargained for a valuable consideration for its reduction; the assignment of the lease to them was immaterial, as the creditors holding bonds have been settled with, and the whole

amount of rent would not pay the difference between the amount of sale under the mortgage and the amount due on the bonds.

They denied that the formation of the Montour Ironworks Company was colorable: the object was to enable Chambers & Co., with the aid of the creditors, to work up the property of the Montour Iron Company, pay the debts of Chambers & Co. and those for which they were liable as sureties of the company and the purchase-money. It failed by reason of Choteau's failure and the general financial embarrassment; it was carried on till the want of money compelled some other mode of carrying out its objects. Choteau sued Chambers & Co. on their note. Chambers & Co. in the fall of 1857 called their creditors together in Philadelphia; they represented the property they had, the state of their indebtedness, and asked the creditors to make an arrangement to take the property and discharge them; after protracted negotiations the arrangement of December 26th 1857 was effected; this was a sale out and out, without secret trusts, understandings, &c. Afterwards it was found that there was a difficulty in the purchasers indemnifying the vendors, and the agreement of February 5th was made with two objects, to modify the undertaking of the purchasers in relation to indemnity and induce the vendors to deliver the property, and to render their personal services in conducting the business, they being skilled in the business and the purchasers ignorant. There was then due by the company to Chambers & Co. $170,000 or more, besides a large claim to Fuller; a judgment for $954,412 in his favor to secure liabilities of Chambers & Co.: while these debts remained the plaintiffs could have no claim upon their own showing. The object of the minute of February 26th was this: the company had received from Chambers & Co. $276,000, part of their purchase-money, which the purchasers from Chambers & Co. were bound to discharge; the creditors to whom the residue was to be appropriated would not receive the notes. At most, therefore, the defendants were to be treated as standing in the shoes of Chambers & Co., and they having discharged their liability, including the debts which these notes were to secure, the defendants had nothing to do with the arrangements of February 26th as to the payment of the balance of Chambers & Co.'s purchase-money and had no knowledge of it. The Blue Farm was useful for the works and but part of the price had been paid, and defendants purchased it with the consent of the company, and have since purchased the equitable title under a mortgage on it. The plaintiffs cannot convert the sale into an assignment for the benefit of creditors, for even if the defendants had obtained the property wrongfully, the Statute of Limitations is a bar, and the defendants aver on belief that the plaintiffs knew all the facts. The defendants denied notice of the minutes, &c., until long after their purchase; denied that Beaver was a

stockholder; the defendants purchased the stock of Chambers & Co. to have control over the franchises, the stock being worthless; that they did not know of the mortgage till after their purchase, when it was examined solely in reference to title, that there never was a surplus and the trust was not for any creditors but the purchasing creditors. They denied fraud; they aver that they have settled with all persons interested except those who united in the last purchase; there are many hundred thousand dollars due by the Montour Iron Company, but the defendants have not been asked nor are they bound to pay them. They further aver that up to March 1859 they were in advance to the concern to the amount of $150,000 or more, when they called all the parties together, who, after full examination, sold out to the defendants and others interested with them at one-half the amount due them.

The motive of taking the lease was to enable them to work up the assets; the sale under the mortgage was contemplated from the beginning, and they deny any fraudulent motive in the purchase under the mortgage or that of any property of the Montour Iron Company. When they became trustees in 1857 the object was to work up the property, convert it into money for those who had thus sunk their claims against an insolvent corporation. Immediately after, unforeseen difficulties arose, purchases for the business could be made only on their personal credit; they were in advance and burdened with liabilities as before stated, liable at any time to be sold out under the mortgage and too deeply in, to withdraw and must continue business by associating others with them, bear all the risk in purchasing the real estate or submit to the enormous loss in winding up, if the property should pass into other hands. The troubles anticipated to the country in 1860 deterred capitalists from entering upon new enterprises and suspended sales of iron. Large bondholders refused to join in the purchase under the mortgage, and after extensive advertising no one bid but the agent of the defendants who purchased at less than one-fifth the mortgage-debt on the 30th of September 1860; the sale was not perfected by conveyance till January 7th 1861, and after the sale the bonds on the property amounting to but $400,000, and being the only lien, were sold in the market much below par. The delay in the sale arose because the trustees under the mortgage proceeded in such manner as would have failed to pass a good title and when they proceeded to sell in execution of their powers negotiations commenced which resulted in all the mortgage-creditors allowing the defendants to purchase at that sale and settle with them for their bonds. The defendants had not the control of all the bonds and if they had had, they are advised they had no right to control the action of the trustees. "They therefore deny that there was any sort or pretence of

title, either legal or equitable, in the premises in the Montour Iron Company after the sale made by the trustees in execution of the power contained in the mortgage by which the said property was sold and conveyed to an agent of these defendants, and by him to the Pennsylvania Iron Company, at their instance." They also answered the interrogatories. A replication was filed and George Bull, Esq., appointed examiner.

J. A. Clay testified that he was instructed to bid at the sale, commencing with $100,000 and advancing, if there should be competition, to $250,000; the property was struck down to him, as agent, at his first bid, and the deed was made to Isaac S. Waterman, Thomas Beaver and three others.

J. C. Bullitt, Esq., testified: As counsel for Waterman and Beaver and their associates, in December 1857, he attended a meeting of the creditors at which the object was stated on behalf of the debtors to be to arrange for the debts of the Groves, Chambers and Fuller owing by them on account of the Montour Iron Company; they stated the amount of debts to be several hundred thousand dollars; and the property they owned, known as the Montour Ironworks, which they were willing to dispose of to their creditors in payment of the debts, and assign the lease so as to work the materials and convert them into railroad iron. Their propositions were assented to by the creditors and witness took a memorandum of the terms, &c., to prepare agreements. He afterwards ascertained from St. G. Tucker Campbell, Esq., who had been of counsel with Chambers & Co. in their purchase from the company, that that transaction had been for a full consideration and their title was indisputable. Witness communicated this to a committee of the creditors and afterwards prepared the agreement of December 26th 1857, which was approved by Mr. Campbell. Choteau & Co. were especially represented in the agreement by Messrs. Maynard and Murdock as trustees, but as Choteau had failed and made an assignment Maynard declined signing and as also did Choteau's assignees at the time. This was the principal difficulty and Chambers & Co. would not let the property pass out of their hands till the agreement had been signed on behalf of Choteau, or the creditors would give them indemnity against Choteau, and all their debts should be discharged.

In February an arrangement was made with the Choteaus under which the creditors agreed to settle their debt. It was to meet these difficulties and secure the services of Chambers & Co. in working up the material, &c., that the agreement of February 5th was made; this was signed on behalf of the Chotcaus, the property was delivered to the trustees of the creditors, and Beaver went to Danville to take possession of it. At all the meetings of the creditors, Chambers & Co. asserted their absolute ownership of the property and the conveyance was made to Waterman,

Beaver and their associates on the faith of their absolute right to convey; there was nothing in all the negotiations to raise suspicion that this property was taken upon any terms but those in the grant. A bill was filed in 1858 by the trustees in the mortgage for its foreclosure, but the Supreme Court decided there was no jurisdiction, and in 1860 the trustees proceeded to sell under their powers as such. An injunction against the sale was asked for on behalf of the bondholders, amongst whom were Waterman and Beaver, in order that the title under such sale might be settled beforehand and the property bring a higher price, or if Waterman and Beaver should be the purchasers their title would be assured; the injunction was refused and the property sold at public auction. After much negotiation an arrangement was made between Waterman and Beaver and other bondholders, by which Mr. Clay was to purchase for Waterman and Beaver and hold the title until everything was perfected to enable them to carry out the settlement with the parties interested. If any one else should bid beyond $250,000 the property was to go, and Waterman and Beaver take their dividend with other creditors. The arrangements being carried out, the property was finally conveyed to the Pennsylvania Iron Company, a mortgage securing bonds for $400,000 given by them and the Montour Iron Company bonds bought up with these bonds. Witness never heard in any of the negotiations till 1859 of the assignment of the rent to J. A. Lewis. Creditors of the Montour Iron Company not connected with Chambers & Co. were not to be embraced in the arrangements of 1857 and 1858.

The defendants gave evidence that in the fall of 1857 the credit of Chambers & Co. had been pledged for the Montour Iron Company to the amount of $596,953.08; that the creditors held collaterals to the amount of $503,121.99; that there were due for wages $22,712.79, and the other debts of the company amounted to $368,945.15, and that the outstanding bonds amounted to $542,055.80.

There was other testimony for the defendants of the same character. There was evidence also in detail of the judgments against the company.

The plaintiffs also gave evidence in support of the allegations in their bill.

The documents referred to in the bill, plea and answer were given in evidence by the parties. The foregoing, with the pleadings, and the facts stated in the opinion of Judge Strong at Nisi Prius will present the circumstances of the case.

Judge Strong at Nisi Prius dismissed the bill with costs, and the plaintiffs appealed.

_E. S. Miller_ and _Meredith_ (with whom was _W. F. Judson_), for appellants.—A bill may be brought with two different aspects:
10 P. F. SMITH—20

[Ashhurst's Appeal.]

Bennett *v.* Vade, 2 Atk. 325; Lloyd *v.* Brewster, 4 Paige 537; Colton *v.* Ross, 2 Id. 396; Wilkins *v.* Wilkins, 1 Johns. Ch. R. 117; Rawlings *v.* Lambert, 1 Johns. & Hemming 458.

1. The paper of December 26th was not a purchase but a trust for creditors. If not that, 2, it was a fraud. As to 1st: Beans *v.* Bullitt, 7 P. F. Smith 221; Chaffees *v.* Risk, 12 Harris 432; Henderson's Appeal, 7 Casey 502. A trustee cannot manage for his own benefit: Ex parte Lacey, 6 Vesey 626; Aberdeen Railway *v.* Blaikie, 1 Macq. 461; Kimmell *v.* Geeting, 2 Grant 128; Hill *v.* Frazier, 10 Harris 320; Whichcote *v.* Lawrence, 3 Vesey 750; Michoud *v.* Girod, 4 Howard 555. The transfer of the lease was an assignment for the benefit of creditors: Lucas *v.* The Sunbury & Erie Railroad, 8 Casey 458. The debts provided for were those of the Montour Iron Company; the fact of others being joined with them as assignors will not prevent the instrument being an assignment for the benefit of creditors: McNutt *v.* Strayhorn, 3 Wright 269. In such assignments creditors are not purchasers: Knowles *v.* Lord, 4 Whart. 500; Foulke *v.* Harding, 1 Harris 245; Twelves *v.* Williams, 3 Whart. 485; McCrelish *v.* Churchman, 4 Rawle 36; Ludwig *v.* Highley, 5 Barr 132.

That the creditors were to release did not make them purchasers: Flanagin *v.* Wetherill, 5 Whart. 280. In Griffith *v.* Rogers, 2 Wright 382, the assignment was a mortgage, which is inconsistent with Driesbach *v.* Becker, 10 Casey 152. In cases of doubt the courts incline to construe an instrument an assignment, not a purchase: Seal *v.* Duffy, 4 Barr 278; Watson *v.* Bagaley, 2 Jones 165; McLellan's Appeal, 2 Casey 463. A trustee to obtain a good title to property at a sale which he could not control, must be under no duty to prevent the sale, and must not have encouraged it: Chorpenning's Appeal, 8 Casey 317; Meanor *v.* Hamilton, 3 Id. 140; Hamilton *v.* Wright, 9 Clark & Finn. 111; Cram *v.* Mitchell, 1 Sandf. Ch. 251; Tanner *v.* Elworthy, 4 Beav. 490; Ex parte James, 8 Vesey 346; Ex parte Bennett, 10 Id. 381. Cestui que trust may claim land purchased with trust-money: Pierce *v.* McKeehan, 3 W. & S. 280; Kauffman *v.* Crawford, 9 Id. 131; Hill on Trustees 522; Drysdale's Appeal, 2 Harris 537. With reference to the lapse of time, it is like a case at law of mutual accounts, where the last item is within six years: Hopkins *v.* Hopkins, 4 Strobh. 207; Vanhorn *v.* Scott, 4 Casey 316; McCoon *v.* Galbraith, 5 Id. 295. The time begins to run when the injury arises, although the cause existed long before: Gillon *v.* Boddington, 1 Car. & P. 541; Stout *v.* Kindt, 12 Harris 449; Lawe *v.* Harwood, Cro. Car. 140; Browne *v.* Gibbons, 1 Salk. 206; Gibbons on Limitations 67, 110; Whitehouse *v.* Fellowes, 9 C. B. 901; Bank of Hartford *v.* Waterman, 26 Conn. 324; Brinkerhoff *v.* Brown, 6 Johns. Ch.

139. The length of time in equity to prevent a party from alleging a constructive trust, has not generally been held to be six years: Clegg v. Edmondson, 8 De Gex, McN. & G. 787; McDonald v. McDonald, 1 Bligh 335; Robinson v. Alexander, 8 Id. 374; Harcourt v. White, 28 Beav. 306.

Laches which would bar an individual standing by himself, will not bar a class: Whichcote v. Lawrence, 3 Vesey 750; Lister v. Lister, 6 Id. 632; Parkston v. Brewster, 14 Ala. 320; Co. of Undertakers v. Mackenzie, 8 Bro. P. C. 42–65.

*R. C. Murtrie* and *G. W. Biddle* (with whom was *S. Dickson*), for appellees.—A purchase by officers of a company is at most voidable: Canal Bridge v. Gordon, 1 Pick. 297; Angell & Ames on Corp. § 233 and cases cited. A trustee may purchase at his own sale for his *cestui que trust*: Ex parte Lacey, 6 Ves. 627'; Ex parte Bennett, 10 Id. 385, 394, 400; Ex parte James, 8 Id. 348; Parkes v. White, 11 Id. 226; Campbell v. Walker, 5 Id. 681; Lister v. Lister, 6 Id. 632. After the relation has ceased a trustee may buy: Whichcote v. Lawrence, 3 Ves. 740; Fox v. Mackreth, 2 Brown's C. C. 400; Coles v. Trecothick, 9 Ves. 246; Beeson v. Beeson, 9 Barr 287; McGinn v. Schaeffer, 7 Watts 414; Clarke v. Law, 22 How. Pr. Rep. 426; Luff v. Lord, 10 Jur. N. S. 1248; Johnson v. Bennett, 39 Barb. 249; Olcott v. Railroad, 27 N. Y. (13 Smith) 567; Wentworth v. Lloyd, 32 Beav. 467; s. c. 10 H. of L. Cases 589; Railway Co. v. Magray, 25 Beav. 586; Dover v. Buck, 11 Jur. N. S. 580. There must be no laches on the party to set the sale aside: Story on Agency, § 210; 2 Story's Eq. § 1520; Smith v. Clay, note to Deloraine v. Browne, 3 Brown's Ch. Rep. 640; Wagner v. Baird, 7 How. 258; Read v. Read, 18 Beav. 398; Champion v. Rigley, 1 Russ. & Mylne; Ld. Selsey v. Rhoads, 1 Bligh N. S. 1; Gregory v. Gregory, Cooper's Cases 201; Bergen v. Bennett, Caines' Cas. 1; Campbell v. Walker, 5 Ves. 680; Chalmer v. Bradley, 1 J. & W. 59; Ex parte James, 8 Ves. 351; Webb v. Rorke, 2 Sch. & Lef. 672; Randall v. Errington, 10 Ves. 427; Parker v. White, 11 Id. 226; Roberts v. Tunstall, 4 Hare 257; Townshend v. Townshend, 1 B. C. C. 550, 554; Bonney v. Ridgway, 1 Cox 145; Andrew v. Wrigley, 4 B. C. C. 125; Collaw v. Hare, 2 R. & M. 675; Cholmondely v. Clinton (Sir T. Plumer, Eldon, C.), 2 J. & W. 190; 4 Bligh 4; Portlock v. Gardner, 1 Hare 594; Ex parte Hasell, 3 Y. & C. 622; Wedderburn v. Wedderburn, 4 M. & C. 13. Such trust can be enforced as to purchasers only against those acquiring the property with notice and without consideration: Sturges v. Morse, 3 De Gex & J. 1; Lewin on Trusts 560, 567; Beckford v. Wade, 17 Ves. 97; Hovenden v. Ld. Annesley, 2 Sch. & L. 633; Clegg v. Edmundson, 3 Jur. N. S. 299;

Pennell *v.* Home, 3 Drew. 337; Pattison *v.* Hawksworth, 10 Beav. 375; Attorney-General *v.* Moor, 8 Id. 119. Presumptions are made by the court in absence of evidence to quiet possession: Eldridge *v.* Knott, Cowp. 215; Grenfell *v.* Girdlestone, 2 Y. & C. 682; Magdalen College *v.* Attorney-General, 3 Jur. N. S. 675; Jones *v.* Turberville, 2 Ves. Jr. 13. Acquiescence is presumed when one having a right sees another dealing in a way inconsistent with it and does not object: Duke of Leeds *v.* Amherst, 2 Phill. 123; Philippson *v.* Gatly, 7 Hare 523; Stafford *v.* Stafford, 1 De G. & J. 202; Jorden *v.* Money, 5 H. L. C. 185; Norway *v.* Rowe, 19 Ves. 158; Pendergast *v.* Turton, 1 Y. & C. 98; Ernest *v.* Vivian, 33 Law J. 513, 517.

As to the length of time. At most the trust is but by implication, and is barred at the end of five years: Act of April 22d 1856, § 6, Pamph. L. 532, Purd. 654, pl. 13. The distinction in equity as to the Statute of Limitations is, that possession for any length of time will not bar a trust created by act of the parties, but the statute as to a constructive trust will run from the time the circumstances making it are discovered: Hovenden *v.* Lord Annesley, *supra;* Clanricade *v.* Henning, 30 Beav. 195; Wentworth *v.* Lloyd, 32 Id. 466; Story Eq. Jur. § 1521 a.; Bruce *v.* Tilson, 25 N. Y. (11 Smith) 199; Whalley *v.* Whalley, 3 Bligh 1; Parham *v.* McCravy, 6 Rich. Eq. R. 140; Kane *v.* Bloodgood, 7 J. Ch. 90; Farnam *v.* Brooks, 9 Pick. 212; Pipher *v.* Lodge, 4 S. & R. 310; Green *v.* Johnson, 3 Gill & Johns. 389; Boone *v.* Chiles, 10 Pet. 223; Willison *v.* Watkins, 3 Id. 52; Hawley *v.* Cramer, 4 Cowen 712; Fleming *v.* Culbert, 10 Wright 498; Downey *v.* Garard, 12 Harris 52; Finney *v.* Cochran, 1 W. & S. 112; Webster *v.* Newbold, 5 Wright 482. But if the defendants were trustees of the real estate they could buy the personal estate: Prevost *v.* Gratz, 1 P. C. C. 373; Fisk *v.* Sarber, 6 W. & S. 18; Cadbury *v.* Duval, 10 Barr 272. Where the transaction is to effect a sale and value is paid by creditors, it will not be construed an assignment: Griffin *v.* Rogers, 2 Wright 382; York Co. Bank *v.* Carter, Id. 446; Fallon's Appeal, 6 Id. 235; Dubois's Appeal, 2 Id. 231. The bill makes a case of actual fraud, and relief cannot be obtained in any other aspect: Glasscott *v.* Lang, 2 Phill. 810; Price *v.* Berrington, 3 M. & Gor. 498; s. c., 7 Eng. L. & Eq. 254; Maguire *v.* O'Reilly, 3 J. & Lat. 224; Fenaby *v.* Hobson, 2 Phill. 255; Wilde *v.* Gibson, 1 H. L. C. 605: Luff *v.* Lord, 11 Jur. N. S. 51; Eyre *v.* Potter, 15 How. 42, 56; Fisher *v.* Boody, 1 Curtis 206. The directors could make an assignment for the company: Dana *v.* Bank of U. S., 5 W. & S. 223; Baird *v.* The Bank, 11 S. & R. 411; Gordon *v.* Preston, 1 Watts 385. The statute does not begin to run anew from investment of funds unlawfully appropriated: McCoon *v.* Galbraith, 5 Casey 295; Flemming *v.* Culbert, 10 Wright 498.

Judge STRONG delivered the following opinion at Nisi Prius, May 2d 1868:—

" The complainants are stockholders of the Montour Iron Company, a corporation formed in 1844, for the purpose of making and manufacturing iron. By the provisions of its charter, the capital stock of the company was divided into 18,000 shares, of which the complainants hold 3328. The bill alleges that the company has had no corporate meeting for several years; that there has been no prétence of an election for officers since the year 1860; that in all respects the stockholders have acted as if the franchises which the company held by its charter had been lost by non-user or abandonment, and that there are therefore no officers who can be called upon to assert the rights of the stockholders. The bill further alleges that of those who were officers of the company, pursuant to the last election, all except Thomas Chambers are dead, and that he cannot be relied upon to assert a claim for stockholders, such as the complainants assert, because it is adverse to his own claims. The case thus being one in which, according to the averment of the complainants, relief cannot be obtained by proceeding in the name of the company, they claim a right to sue directly in their own names, as stockholders.

" The bill alleges in substance that the defendants Waterman and Beaver are trustees for the Montour Iron Company, and thus indirectly for the complainants themselves; that as such trustees they acquired the possession of a large amount of personal property belonging to the company, with the avails of which they have purchased other personalty and also the real estate, including the iron works, foundries, machine-shops, furnaces, &c., which constituted the principal property of the corporation, and that they have rendered no account of the administration of the trust property, or of their acts and doings as trustees. The principal relief sought is that the said defendants may be decreed to account and to convey to the Montour Iron Company the real estate purchased by them as aforesaid. Other relief is asked, the ground for it all being, however, that the defendants Waterman and Beaver are trustees, liable to account.

" Such is the substance of the bill. The answer denies that any such trust as is charged ever existed, and the case comes before me on the bill, answer and proofs.

" After a careful examination of the bill I am unable to discover whether it intends to charge a trust in the defendants arising out of fraud in those from whom they obtained the property, or in themselves—that is, a trust *ex maleficio*—or whether it intends to charge a trust as growing out of a contract. Both it cannot be, and it may be doubted whether, if the bill charges a trust growing out of a fraud, the complainants can assert now any other title to relief. Certain it is that no express trust is either

[Ashhurst's Appeal.]

charged or proved. The defendants have acquired no property of the Montour Iron Company by any instrument that expressly recognised the company as their *cestui que trust*, and they have made no declaration of trust. If, then, they are chargeable as trustees, the trust must be a constructive or implied one, and this whether it arose *ex maleficio* or out of a conveyance or contract. The circumstances attending its supposed origin, and the facts out of which it arose, if it ever did arise, are summarily these:— On the 19th day of September 1857, the Montour Iron Company was the owner of certain real estate in Columbia county, consisting of foundries, furnaces and ironworks generally, subject to a mortgage for $600,000, and still other encumbrances. The company also owned personal property, consisting principally of iron ore, and coal on the bank and of manufacturing tools. The appraised value of the personalty was $304,951.66. This was afterwards ascertained to be very much above the real value, at least $40,000. But the company was then hopelessly insolvent. Its debts considerably exceeded $2,000,000. Of these $503,121.99 were secured wholly or in part by the pledge of collaterals. For other $596,953.08, Thomas Chambers, Henry M. Fuller, John P. Grove and John Grove or some of them were endorsers or sureties for the company. Beside this, other $391,657.94 of debts were outstanding, secured neither by mortgage nor by collaterals, nor by the suretyship of Chambers, Fuller, or the Messrs. Grove or of either of them. Fuller was also himself a very large creditor, and there was due for wages a sum exceeding $22,000. Judgments had also been obtained against the company, and it is manifest that the company was not in a condition to go on with its business or even to save its property from sacrifice.

"At this time, Messrs. Chambers, Fuller, John P. and John Grove were the president, vice-president, and directors of this corporation. They had, for some time previous, carried on its business by pledging their personal responsibility. It was in this condition of affairs that a meeting of the stockholders was called, and it was held on the 15th day of September, 1857. On the minutes of the company it appears to have been held pursuant to notice, and the bill, though it sets out the meeting, does not deny that the complainants had notice of it. At the meeting, the only stockholders present were Thomas Chambers, Henry M. Fuller, John P. Grove and John Tucker. But they represented more than two-thirds of the entire stock. The complainants were not present. Very possibly, perhaps probably, their absence was due to the fact that they had very little interest in anything that could then be done. In the condition in which the company then was, their stock was of absolutely no value, and they were not creditors, unless it may have been under the $600,000 mortgage. Not much was done at this meeting of September 15th, though

[Ashhurst's Appeal.]

the financial affairs of the company were considered, and the opinion was expressed that the works could not be kept in operation. An adjournment then was made to the 17th, and again to the 19th of September. On the last-mentioned day, the same stockholders were present, except John Tucker—and Timothy Bryan, Jr., also attended. It was then resolved, that inasmuch as the interests of the company required some prompt arrangement to furnish means to pay its indebtedness, and propositions to purchase the personal property and take a lease of the realty had been made, the directors should be requested and directed forthwith to make and duly execute a bill of sale of all the personal property of every kind belonging to the company, at the price of $304,951.66, to Thomas Chambers, John P. Grove, John Grove and Henry M. Fuller, for their notes upon such terms and for such time as might be agreed upon. It was also resolved, that the directors be requested and directed to make and execute a lease of all the real estate and works of the company to the same parties, for the term of five years, at the yearly rent of $40,000. The minutes of the board of directors show, that on the same day a meeting was held, at which Chambers, Fuller, John P. Grove and Bryan were present, and at which it was resolved to carry out the instructions given at the meeting of the stockholders. Accordingly a lease was executed for the real estate. A bill of sale of the personalty was also made, and Fuller, the Messrs. Grove and Chambers, gave their notes to the company for its appraised value, to wit, $304,951.66; one note for $265,000, and four others for $9987.91 each. The note for $265,000 was shortly afterwards transferred to P. Choteau, Jr. & Co., who were then creditors of the company for that amount, in lieu of a bond and warrant of attorney for that sum which they held. The company also executed to Choteau & Co., a mortgage in like amount upon the real estate already encumbered by the mortgage for $600,000, and other liens. A mortgage was also made to Fuller, for $477,206.05, upon the same property, doubtless to secure the debt due him, and to protect him against the liabilities he had assumed for the company. At once, on the execution of the papers, the purchasers took possession of the personal and real property. They opened a new set of books, and put up a new sign. They made iron until the end of that month (September), when the workmen stopped for want of payment.

" On the 26th of September the rent reserved in the lease of the real estate was, by an instrument of writing bearing that date, assigned to John A. Lewis, in trust, to pay out of it, *First*, the interest on the coupon mortgage bonds (secured by the $600,000 mortgage). *Second.* To appropriate the surplus to the formation of a sinking fund, consisting of $28,000 annually, to be paid into

it, as covenanted in the mortgage. *Third.* To pay any surplus in discharge of the interest upon the debt due P. Choteau, Jr. & Co. *Fourth.* To apply any surplus to the payment of the principal of the bonds secured by the $600,000 mortgage. *Fifth.* To pay any remaining surplus upon the principal of the debt due Choteau & Co.; and *Sixth.* To pay any surplus to the Montour Iron Company. On the same day John A. Lewis accepted the trust, though it is obvious the rent assigned was utterly inadequate to the purposes named in the assignment.

"I pause here in the statement of the facts as they appear in the cause, intending to continue the narrative hereafter. It is in what has already been detailed, that the complainants insist the origin of the trust is to be found, if I understand their bill and the argument. Though it is not directly charged that the sale of the personal property, and the lease of the realty, were fraudulent as against the company or the stockholders, it is sought to treat them as fraudulent, and for this reason to construe the purchasers and lessees to have been trustees. The argument is, they purchased for themselves from themselves, as directors, under authority given by themselves as stockholders. The consideration for the sale was fictitious. The transfer was of the entire property of an insolvent corporation. It was not a transfer for the purpose of raising means to pay the indebtedness of the company, and therefore was unauthorized by the stockholders' meeting. Its design and effect were to hinder and delay creditors of the company, and the assignment of the lease was unauthorized by the stockholders. This is the argument, and the deduction is, that equity will hold the purchasers mere trustees for the company. Two of the branches of this argument require little notice. The assignment of the lease to John A. Lewis was an act fully within the power of the directors, without any special authority given by the stockholders. It was a transfer of a chose in action to secure the payment of debts of the company. And if this were not so, I do not perceive how it could affect any title which the purchasers of the personalty or the lessees of the realty had previously acquired. Nor is it material to this case whether the design and effect of the sale of the lease were to hinder, delay and thus defraud the creditors of the company; for if such was the purpose, it would not make the purchasers trustees for the company or its stockholders. Creditors could have avoided what was done, but the complainants are not claiming as creditors, or through creditors. They are not invested with the rights of any creditors intended to be defrauded. I have very little doubt that one motive for making the arrangement described in the resolutions of September 19th 1857 was to avoid a seizure and sacrifice of the property by creditors of the corporation, and it may be that the assignment of the lease was to prevent possible attach-

[Ashhurst's Appeal.]

ments. But it does not necessarily follow that even creditors could have denied effect to them. If the sale was in fact made to procure the means of paying debts; if it was for a fair price, and especially if its proceeds, whether money or notes, were applied to the payment or security of debts, other creditors could not avoid it. And certainly the vendor could not; neither could any stockholder, merely because it operated to hinder some creditors not preferred. And in view of the circumstances under which the sale of the personal property was made, and in view of the nature of the property, I think it would be going far to hold the sale a fraud upon anybody, because it was a transfer of all the personalty. It is manifest that the company was unable to go on with its business. Its insolvency was complete. Loaded as it was with mortgages and other debts, having pledged as collateral what it had to pledge, having nothing left but tools, iron-ore, and coal upon the bank, parting with all the personalty was not breaking up the business. That had been broken up before. It was not a diversion of the property from the legitimate objects of the corporation. The only thing, then, remaining for the company to do was to pay its debts, so far as it had any means of payment. Its obligation was to apply to that end all its personal property. And what it had was of such a kind that it could not be sold well, either in parcels, or to any other persons than those who had a right to make use of it in the furnaces or other works. To lessees of the iron works it was of more value than to any other persons. And I cannot avoid the conviction that a swift sale of the entirety was necessary to save it from sacrifice under executions. My observation has taught me that, for property of such a kind, it is always difficult to find a purchaser. It cannot often be done, unless the purchaser can have the right to make use of it at the works on the bank of which it lies. To such a purchaser a sale of the whole would be comparatively of more value than the sale of a part. And if parting with all the personalty was a necessity, nay, if it was a duty, to enable its application to debts, what difference can it make, that it was sold as one lot, instead of being sold in ten, if an adequate price was obtained? Beyond doubt the directors might lawfully have sold all the tools and coal to ten different persons by the different contracts, taken the notes of the different purchasers, and used them in settlement of the debts of the company, or in relief of the company's sureties. No stockholder would have had a right to complain, in view of its utter inability to prosecute the business for which the corporation was formed. I acknowledge the general rule that directors of a company have no right to do an act which is foreign to the purposes of its creation. They cannot break up its business unnecessarily. But I cannot overlook the situation of the Montour Iron Company when this sale and lease were made. It was

not then foreign to the purpose of its creation, or to its duty, to use all its personal property in discharge of its liabilities. It was a necessity.

"Nor can I convince myself that the sale was merely colorable, or that the consideration was fictitious, rather than substantial. That the price named was adequate and more than adequate, most clearly appears. It was more than $40,000 above the value of the property. The sale was made at cost prices, and the quantity was estimated, the bill of sale being founded upon an estimate and appraisement which proved to be much too large. The notes of the purchasers were given for the price. One of these for $265,000 (which was more than the value of the property according to its real quantity), was transferred to P. Choteau, Jr. & Co., in exchange for a bond and warrant of the corporation for a like sum, and, as the other evidence in the case shows, it was subsequently satisfied, and not by the company. The other notes (each for $9987.91), at three, six, nine and twelve months, were offered to other creditors but refused, and more than five months after they were given, the company cancelled them, still retaining a claim for the amount against the purchasers. In view of the deficiency in quantity of the ore and coal, the promissors perhaps had a right to allege that the consideration of those notes had failed. This, however, is immaterial. But what was done five months after they were given, does not show that the consideration of the sale was fictitious. Indeed, I see no evidence that the sale and its consideration were not as real as any sale could have been.

"I come then to consider the facts that the purchasers were the same persons as those who as directors sold, and as stockholders authorized the sale. It is often said, and truly, that the same persons cannot be both buyers and sellers in one transaction. They were not strictly in this. All the purchasers were not directors who made the sale. But I make no account of that. Still why may not directors of a corporation sell to themselves? Each director has an interest distinct and antagonistic to his interest as a mere man. There is identity of person but not of interest. There must be many things which directors can do for their individual benefit which are binding upon a corporation of which they are directors. If they have advanced money I cannot doubt they may pay themselves with corporate funds. If they have become liable as sureties for the corporation they may provide for their indemnity. And though ordinarily the law frowns upon contracts made by them in their representative character with themselves as private persons, such contracts are not necessarily void. They are carefully watched, and their fairness must be shown. But I repeat the question, why may not directors sell to themselves in any case? It is because of the danger that the

interests of stockholders may suffer, if such sales be permitted, for want of antagonism between the parties to the contract. But such sales are supported in equity where the fiduciary relation of the purchaser has ceased before the purchase, when the purchase was made with full consent of the stockholders, or where stockholders have by their acquiescence debarred themselves from questioning the transaction. In the present case, starting from the position that there was no actual or intended fraud (which I think must be assumed), I cannot overlook the fact that the sale to Chambers, Fuller and the Messrs. Grove, precisely as it was made, was authorized by the stockholders at a meeting regularly · called, of which I think there is evidence these complainants had notice. I cannot see why the action of the stockholders' meeting is not binding upon all who then held stock, and who did not dissent. If the company assented to the sale and to its terms before it was made, upon what principle can it complain now? If the complainants must be held to have assented to what the stockholders' meeting did (they having had an opportunity to dissent at the time, and not having dissented), how can they afterwards attack the sale, or claim that it did not pass to the purchasers an absolute right to the property? I can well understand why it may have been that no stockholder objected. The plan of converting the personal property into notes was apparently the best that could have been adopted, and it could not possibly harm any stockholders. They were beyond the reach of additional harm.

"I do not, however, deem it necessary to decide that the sale in this case was absolutely indefeasible. The utmost the complainants claim is, that it was voidable. Certainly nothing more can be claimed. Let it be, then, that it might have been set aside at the instance of the corporation, or even of a stockholder, as against the policy of the law and constructively fraudulent. Still it was valid in equity as well as in law, unless one or the other chose to avoid it. And in all cases in which an attempt is made to fasten a *constructive* trust upon a purchaser the attempt must fail, unless made in a reasonable time. Acquiescence is presumed from delay. Lapse of time, indeed, is no bar to the assertion of a direct trust, but not so when the trust is constructive. If a trustee to sell become the purchaser his purchase is generally voidable, but the *cestui que trust* must move to avoid it within a reasonable time: Campbell *v.* Walker, 5 Ves. 678; Hawley *v.* Kramer, 4 Cowen 718; Prevost *v.* Gratz, 1 Peters's C. C. Rep. 368; Clegg *v.* Edmundson, 3 Jur. N. S. 299. This last case is instructive in many particulars. In Beckford *et al. v.* Wade, 17 Ves. 87, Sir William Grant said: 'It is certainly true that no time bars a direct trust as between *cestui que trust* and trustee; but if it is meant to be asserted that a court of equity allows a man to make out a constructive trust, at any distance of time

after the facts and circumstances happened out of which it arises, I am not aware that there is any ground for a doctrine so fatal to the security of property as that would be; so far from it, that not only in circumstances where the length of time would render it extremely difficult to ascertain the true state of the fact, but where the true state of the fact is easily ascertained, and where it is perfectly clear that relief would originally have been given upon the ground of constructive trust, it is refused to the party who after long acquiescence comes into a court to seek that relief. In proof of this it is not necessary to produce any other case than than of Bonny v. Ridgard (cited in 4 Brown's Ch. Cas. 138), in which Lord Kenyon, when Master of the Rolls, on the sole ground of length of time, reversed a decree by which Sir Thomas Sewell had granted relief against a fraudulent purchase, and had declared the purchaser to be a trustee for the plaintiffs in the cause, Lord Kenyon agreeing perfectly that the purchase was originally fraudulent, and that the defendant must have been held to be a trustee if the suit had been brought in proper time.' See also Hovenden v. Lord Annesley, 2 Sch. & Lef. 633; Wentworth v. Lloyd, 32 Beav. 467, affirmed in the House of Lords, 10 H. L. C. 589. To this effect the cases are very numerous. It would extend my remarks much too far to cite them. They are all sustained by the principle that equity presumes against the existence of a trust unless it be asserted within a reasonable time. The principle is essential to the security of property. It is in harmony with the course of human conduct generally, and it is in most cases accordant with the actual fact. But what is the reasonable time within which a constructive trust must be asserted? The cases do not clearly define it, and perhaps it is incapable of strict definition. It must vary with the circumstances of each case. For myself, I think it may safely be laid down that when a party claims to hold another a trustee of personal property under a constructive trust, he must assert the claim within six years from the time when the trust is alleged to have originated, in analogy to the Statute of Limitations. He cannot be permitted to make the assertion afterwards. This, I think, should be regarded as the general rule. There may be cases when even six years cannot be allowed, as when a party having a right to set aside a transaction, or treat it as a trust, stands by and sees another dealing with the property in a manner inconsistent with any trust and makes no objection: Duke of Leeds v. Amherst, 2 Phill. 123; Jordan v. Money, 5 H. L. C. 185. And so when the rights of third persons may have intervened. So also where the property is of a peculiar kind, and the alleged trustee, in ignorance of any intention to hold him to an account, relying upon his ownership, enters upon a hazardous business or incurs large responsibilities. At least this is true when the alleged constructive trust does not grow out of actual

or intended fraud.  It has often been said that equity obeys the Statute of Limitations, and it has been held that laches for a much shorter period than six years, aided by other circumstances, will bar a right.

"To apply these principles to the present case.  If the sale of the personalty of the Montour Iron Company, on the 19th of September 1857, was a breach of trust, if the purchasers held the property after the purchase, as trustee for the company or its stockholders, if by bill in equity the sale might then have been set aside, the right to apply to a court for relief accrued immediately.  It was neither equitable nor consistent with good conscience that the company, or those claiming through it, should wait to see whether the purchasers made money out of the transaction before they began to move.  But this bill was not filed until the 12th of January 1865, seven years and nearly four months after the right of the complainants to sue, if any they had, came into existence.  And I cannot doubt that they had knowledge of the arrangement which was made on the 19th of September.  Apart from the entries in the minute books of the company, of which they must be presumed to have had notice, and which fully revealed what was done, there is enough to show that they could not have been ignorant.  They were large stockholders.  The office of the company was in this city, where they resided.  The sale and transfer of possession were public and notorious, and they were recorded.  They terminated the possibility of the company's prosecuting business.  Beside this, the bill does not deny that the complainants knew what was done.  It impliedly admits they had notice, by the very cautious manner in which it speaks.  Its language is, 'if *all* the stockholders had notice of the meetings of September 15th, 17th and 19th, and of the very important business to be transacted thereat, which complainants do not, however, admit, they must have had unusual reliance on their officers, &c.'  There is nothing then to excuse the delay in bringing the suit, and the complainants must bear the full weight of their laches.  If there were nothing more in the case, I should feel constrained to hold that they cannot now be permitted to assert any equity in themselves in the property purchased by Chambers, Fuller and the Messrs. Grove.

"But there is more.  After the purchase and the lease the purchasers went into possession ostensibly in their own right, and went on manufacturing for a few days until the hands stopped work because of the non-payment of their wages.  The load was apparently too heavy for the purchasers to carry.  In the November following (1857), they attempted to transfer the lease and the personalty to the Montour Iron Works Company, a new corporation organized by themselves, and of which they seem to have been the only proprietors.  The Montour Iron Company gave their assent to the transfer of the lease, or rather of the

assignment of the term, and also directed another lease, between themselves. and Philip Maus, to be transferred to the same assignees. Nothing seems to have been effected by this plan, and on the 26th of December next following, an agreement was made between the purchasers of the first part—the Montour Iron Company of the second part—such creditors as signed the agreement of the third part—Waterman, Beaver and certain other named trustees of the parties of the third part of the fourth part, and the Montour Iron Works Company of the fifth part. I shall not attempt to state all the provisions of this agreement. The material parts were these: Chambers, Fuller, &c., agreed to assign, transfer and deliver to Waterman and others, of the fourth part, or cause and procure such an assignment to be made (they had already assigned to the Montour Iron Works Company), the lease and all the personal property sold to them by the bill of sale of September 19th 1857, and also certain other contracts and other property, some of it being property held by some of the purchasers in severalty. In consideration of these 'agreements and of the full execution thereof, the signing creditors of the third part agreed to release, acquit and discharge the parties of the first part, and the firms of which they were members, from all claims, debts and demands, as set forth in schedules. It was agreed the instrument should go into effect when it should be signed by all the creditors who it might be agreed were not secured in full for their debts, or when Chambers, Fuller, &c., should be indemnified against the claims of all such creditors as should not sign it. Power was given to Waterman *et al.* to arrange with creditors holding any of the debts mentioned in the schedule, so as to procure a release of the said assignors, or to protect and indemnify them, and for such purposes to make contracts in advance of the execution of the agreement. The agreement was to be null unless signed within fifteen days by all the parties whose signatures were required, or if releases, protection or indemnity were not obtained against all the scheduled debts. The Montour Iron Works Company gave their assent, and bound themselves to do all necessary acts to enable the parties of the first part to carry out the agreement. The Montour Iron Company acknowledged that all the debts mentioned in the schedules (debts of Chambers, Fuller, &c.) were contracted on their account, and that they were bound for the same, and they agreed to remain bound, and that the agreement was made with their consent and approbation, and that it should not operate as a release of the company. They also agreed to reduce the rent of the real estate to a nominal sum. Most of the other provisions relate to the power and duties of the trustees for the scheduled creditors, parties of the third part.

" After this agreement was written there appears to have been difficulty in procuring the necessary signatures, releases or indem-

nities to give it effect. Choteau & Co., who held the note of the assignors for $265,000, had failed and made an assignment. The assignee declined entering into the arrangement, and Waterman, Beaver, &c., entered into an accord with him to settle the claim on the 3d of February 1858, by which they bound themselves to pay it at the rate of 50 cents on the dollar with railroad iron at $50 per ton. This agreement was complied with. During all this time, while Waterman and Beaver were assuming these large liabilities, and while the creditors, on the faith of a right in Chambers and his associates to sell the property, were releasing their claims, not a sound was uttered insinuating the existence of any equitable rights in the Montour Iron Company or its stockholders. On the 5th of February 1858, another agreement was made between Waterman and his associate trustees and Chambers and his associates. I think it was the consummation of the previous agreement of December 26th. It completely assured the property to the trustees, and it fastened upon them the duties prescribed by that instrument. From that time until this bill was filed they have gone on, first all the trustees in the administration of the trust until September or October 1860, then Waterman and Beaver in their own right, they having purchased the right of the creditors for whom they were at first trustees. Waterman and Beaver also made large advances, not less than from $150,000 to $300,000. In the year 1860 the real estate was sold by virtue of proceedings on the $600,000 mortgage, and the defendants, Waterman and Beaver, became the purchasers. I do not think it necessary to state the facts more in detail. I have referred to all that in my judgment have any bearing upon the question whether Waterman and Beaver are trustees of the Montour Iron Company or of the complainants. It is claimed they are, because Chambers, Fuller and the Groves were, and because they succeeded to the rights of Chambers & Co., with notice of the circumstances attending the purchase from the company. I do not pause to inquire whether they had such notice or not. I may assume for the present they had. No trust was ever asserted until 1865. None was ever hinted at. There is no reason to suppose that Waterman and Beaver ever dreamed there was one. Can the complainants be permitted to assert there was a trust, after having remained quiet and silent, while the defendants were assuming such large responsibilities, investing such sums of money and incurring all the hazards of a perilous business? Is it equitable for the complainants to run no risk and wait seven years, in order to see whether the enterprise would prove successful, before they move to redress what they claim was a wrong to them, a fraudulent sale by their agents? I cannot think it is. Had they moved when they should have done, if the sale to Chambers was voidable, it would have been only just to the purchasers and

their transferees, though it could have been of no service to themselves, while it must have resulted in disaster to the creditors of the company of which they were stockholders. Clegg *v.* Edmondson, 8 De Gex, McNaughton & Gordon 787, is a case of an attempt to set up a constructive trust, with far more reason than I discover in the present case, but it failed because of the laches of the complainants. A number of persons were partners in a mine held by lease, expiring September 29th 1846. In July the managing partners gave notice of dissolution, and in August agreed with the landlord for a new lease. In September they gave the others notice of their intention to apply for a new lease. In December the lease was executed to them in pursuance of the August agreement. The others never assented, but claimed an interest, not, however, filing a bill until 1855. It was held that, having with full knowledge of their rights, founded on a constructive, not express trust, allowed the others to carry on the business so long, they were barred. Here there was an undoubted trust, but the Lords Justices Bruce and Turner considered the laches aggravated, in view of the hazardous nature of the business asserted to have been carried on in trust for the complainants. I would quote at length from the judgment, were it not for the extreme length to which my remarks have been protracted. What was said by the Lords Justices is very applicable to this case. See also Ernest *v.* Vivian, 33 L. J. Ch. 517, 513. I will refer to no more authorities touching this branch of the case. I have said enough to show that the complainants cannot now be heard to assert that the sale made on the 19th of September 1857 to Chambers, Fuller and the Messrs. Groves, was not what it purported to be—an absolute sale without any trust. Their acquiescence confirmed it, if it needed confirmation, and if, indeed, it may not be held that they had previously authorized it.

" There remains only to consider the effect of the agreement, dated December 26th 1857. It is alleged, that under this, its parties of the fourth part, including Waterman and Beaver the defendants, became assignees or trustees for the benefit of all the creditors of the Montour Iron Company, including the holders of the coupon bonds secured by $600,000 mortgage, and that, though the said assignment was voidable by the Montour Iron Company or its creditors (it not having been recorded within thirty days), if not avoided, there was a resulting trust to the said company for the benefit of its stockholders, of the surplus after payment of the debts.

" I may throw out of this the alleged voidability of the instrument. It can have no bearing upon its construction, though I confess myself unable to see how the Montour Iron Company could have avoided it. Even if it was an assignment for the benefit of the creditors of the company, and made by the com-

pany, the creditors only could have taken advantage of the fact
that it was not recorded as required by law.    I have already
noticed that the complainants are not clothed with the rights of
creditors.    They sue as stockholders.    But this is immaterial.
The agreement never was avoided, and the fact that it was void-
able, if such was the fact, sheds no light upon its meaning or
nature.    Did it then raise a resulting trust for the Montour Iron
Company ?

"I have to remark, first, that it was not intended to be an
assignment in trust for the benefit of the creditors of the com-
pany, certainly not such a technical assignment as left a resulting
interest in the assignors, whoever they were.    This appears upon
its face.    It is expressly so declared.    No surplus is spoken of ;
none appears to have been contemplated.    This, it is true, is not
conclusive.    The character of an instrument is not to be deter-
mined by what the parties have called it.    I am bound to look to
its legal effect.    But this agreement has none of the peculiar
characteristics of such an assignment, either in its parties, its
subject, or its purposes.    It is in form and substance a purchase
by the creditors of Chambers, Fuller and the Groves, whose
names are signed to it, of the property therein described. There
are nominally five parties to it, but there are only two who have
anything to do with the transfer of property.    These are Cham-
bers, Fuller and Messrs. Grove, and the creditors aforesaid repre-
sented by their trustees.    It is the former who agreed to convey,
and it is they alone.    There is not a word that questions their title
to the property, or intimates that anything more than their title
was to pass.    The Montour Iron Works Company were made
parties manifestly only because the nominal title had been passed
to them, and to enable Chambers and his associates to transfer
an unclouded right.    But the Montour Iron Company undertook
to transfer nothing.    No mention is made of any interest which
it had or may be supposed to have had.    It employed no opera-
tive words of transfer.    Why it was made a party I will con-
sider hereafter.

"And not only were Chambers, Fuller and the Groves the only
parties who undertook to transfer, or cause to be transferred, but
the property which was the subject of the contract was theirs.
It was described as "the personal property and effects which were
sold and delivered to the parties of the first part (Chambers,
Fuller, &c.), by the bill of sale of September 19th 1857, and
were afterwards, on the 13th of November 1857, transferred to
the Montour Iron Works Company."    It was their right, under
that sale, that was intended to be passed, a right which the agree-
ment does not question.    I have already shown that the com-
plainants are not at liberty to aver that that sale did not vest the
absolute interest in its subject in the purchasers, or that the Mon-

10 P. F. Smith—21

tour Iron Company had any interest in the property, either legal or equitable, after the 19th of September 1857. It must be taken as a fact that the personalty and the term belonged absolutely to Chambers and his associate purchasers, or to the Montour Iron Works Company, who were but another name for Chambers & Co., when the agreement of December 26th 1857 was made, and when it went into operation. All the other property is described as certain contracts held by the Montour Iron Works Company, or certain rights held by John P. Grove, or by him and John Grove, or stock and rights unquestionably belonging to Chambers *et al.*, or to some of them. No ownership of the Montour Iron Company is intimated, no property right of theirs is described, and no hint is given that any title of theirs was to be ;transmitted. Again, the transaction was, as I have said, in form and in substance a sale and a purchase. The creditors of Chambers & Co. were purchasers for a price, Waterman and Beaver taking the legal right as trustees for them exclusively, doubtless because their number was too great to admit of convenient management by them all. . The consideration for the sale was the release of *their* claims upon Chambers, Fuller and the Messrs. Grove, and the release of or indemnity against all claims upon the same persons held by those of certain scheduled creditors who did not sign the agreement. This was a substantial consideration, and it was much more than the value of the property transferred. How, then, could there have been a resulting trust for anybody? If any, it must have been for Chambers, Fuller and Groves, not for the Montour Iron Company. If the property transferred did not belong to that company, and if a full price was paid for it, vain must it be to contend that there is any trust in the company, any rights to a surplus.

"Again, not only were the Montour Iron Company not the assignors, not only did the property transferred not belong to them, and not only was it purchased and paid for, but Waterman and Beaver, the persons to whom it was transferred, did not take it in trust for any creditor of the company, as such. True, they took it in trust; they were denominated trustees, and such they were. But their trust was clearly and expressly defined. It was not to hold or to manage for the company or its creditors, but to hold for the creditors of Fuller, Chambers and Groves. The fact that those creditors were also creditors of the company, or that some of them were, is of no importance to the inquiry whether the agreement raised a resulting trust for the company. The real question is, for whose liabilities was the provision made? To the trust defined, it was of no consequence whether the liabilities of the company were discharged or not.

"Why, then, was the Montour Iron Company a party to the agreement? The answer is obvious. The debts and liabilities of

Chambers, Fuller and Grove had been incurred for the company. They consisted in part of endorsements of the company's paper, in part of personal credit pledged, and in part of drafts drawn by Fuller upon J. P. & J. Grove, and endorsed by Chambers, the company not appearing to be a debtor, though in equity it was. Largely, therefore, Chambers and his associates were sureties. It was the duty of the company to relieve them from their liability as such. The agreement of December 26th 1857 looked to their relief. It may well have been that the creditors whose names were wanted to the agreement hesitated to sign it, fearing that they might thereby release not only Chambers & Co., but also the company. It was plainly to remove such an apprehension that the 17th article of the agreement was inserted, which acknowledged the company's primary liability, and gave consent to its continuance, notwithstanding the agreement. It was but an act of justice to the creditors as well as to the sureties. It tended to facilitate the arrangement by which the sureties sought relief, while at the same time it parted with no rights of the company, and assumed no new liabilities. I think this is the whole meaning of the 17th clause of the agreement. To my mind it satisfactorily accounts for the fact that the Montour Iron Company became a party.

"By the 25th article, it was stipulated that the company should consent to a cancellation of the lease of the realty, and give a new lease to Waterman, Beaver, &c., for a nominal rent, or should agree to its transfer to them, reducing the rent to a nominal sum. It may be remarked, that if the assignment of the rent previously made to John A. Lewis was a real transaction, the stipulation was wholly inoperative. But pass this by. It is impossible to form a correct opinion of any part of the case, without considering the actual condition of the company in September and December 1857. It was hopelessly insolvent, and unable to use the realty for the purposes for which it was intended. Chambers, Fuller and the Groves had failed to carry on the works. The workmen had stopped for want of payment. A foreclosure of the mortgage, or a sale under it, and a consequent avoidance of the lease, were apparently inevitable at an early day. No one would have purchased the ore and coal on the bank, without having the temporary use of the works in which to use up the personal property. The company was in debt to Chambers, Fuller and Groves more than twice the entire rent for five years. This indebtedness might have been defalcated. In these circumstances, it was not unreasonable that the rent should be relinquished, especially as it was manifestly necessary to enable Chambers, Fuller & Co. to complete an arrangement to save themselves from liabilities incurred for the company, and to the amount of $265,000, at least in discharge of the company. It was certainly no wrong to the stockholders. The most that can be said of it, is that it was a release

of a chose in action, and how a release of a claim against property held by an assignor can make the assignee of it a trustee for the releasor, I have not been able to discover.

"Upon the whole, then, I think the agreement of December 26th 1867, consummated by that of February 5th 1858, cannot be regarded as an assignment to Waterman and Beaver, in trust for the benefit of the creditors of the Montour Iron Company. It left no resulting trust in favor of the company. It is incredible that those who took under those agreements ran all the risks, invested their own money so largely, and assumed such responsibilities, unless it was intended and understood that they took absolutely. I feel that I should be doing great wrong to the parties, were I to decree otherwise. I should be giving an effect to those instruments never contemplated, and raising up a trust in the absence of a single essential to its existence.

"I might add much more. There are facts upon which I have not remarked, that tend to strengthen the position I take. There are some, supposed by the complainants to have significance, which I have not overlooked, though I say nothing of them now. Of course, after what has been said, it will be plain that in my opinion any claim for liability of the defendants to account for the real estate, must be without foundation. Such a claim can rest only upon the establishment of a trust in the personalty for the Montour Iron Company, and consequently for the complainants, and that has not been established.

"The complainants' bill is therefore dismissed with costs."

The judgment of the Supreme Court was entered February 23d 1869.

PER CURIAM.—After a very careful examination of this case, with reference to the facts and law involved, and the arguments of counsel, we are unable to discover error in any of the conclusions arrived at by our brother, Strong, J., who heard it at great length at Nisi Prius; we, therefore, affirm the order dismissing the bill of the complainants with costs, for the reasons stated in the opinion of the learned judge.

Appeal dismissed at the costs of the appellants.