MARY J. McCAMPBELL v. FOUNTAIN HEAD RAILROAD CO.
*et al.*

(*Knoxville.*   September Term, 1903.)

1. **CORPORATIONS.** Railroad corporation's subscription for
   stock in a land corporation is ultra vires.

   The subscription for stock in a land corporation made by a rail-
   road corporation organized and existing under our laws ex-
   ceeds its charter powers, and is *ultra vires,* and the result is
   not altered by the fact that the subscription was made in the
   names of trustees for the railroad. (*Post, p.* 67.)

2. **SAME.** Accommodation indorsements are ultra vires.

   In the absence of express or necessarily implied power given in
   the charter and by the law, one corporation can not indorse
   paper for the accommodation of another, and such indorse-
   ment is *ultra vires.* (*Post, pp.* 68, 74, 80.)

3. **SAME.** Relief of minority against majority stockholders in
   chancery prerequisite, exception.

   Courts of equity are prompt to redress the injuries of minority
   stockholders against the wrongdoing of majority stockholders.
   But prerequisite to the relief in chancery, the minority stock-
   holders must seek their remedy through the corporation with-
   out success, except when it appears that to seek such relief
   would be an idle ceremony. (*Post, pp.* 68-69.)

   Cases cited and approved: Hawes v. Oakland, 104 U. S., 450;
   Detroit v. Deane, 106 U. S., 537.

4. **SAME.** Same. Case in judgment.

   Where a railroad corporation and its majority stockholders own
   all the stock in a land corporation, and the board of directors
   of both corporations are composed of the same persons, and
   the railroad corporation has indorsed paper for the land cor-

poration representing indebtedness due to the majority stock-
holders in the railroad corporation, the minority stockholders
of the railroad corporation are not required to seek relief
through the railroad corporation before maintaining a suit in
chancery for relief against indorsements for, and the taking
of stock, in the land corporation. (*Post, pp.* 58-69.)

5. **SAME.** Stockholder participating in or acquiescing in ultra
vires acts cannot avoid same.

The stockholders in a corporation who actively co-operate with
the other stockholders in authorizing, consenting to and pro-
curing *ultra vires* acts to be done, or who acquiesce therein
for an unreasonable length of time, can not afterwards avoid
the same by a suit in chancery. (*Post, pp.* 69-80.)

Cases cited and approved. Dunphy v. Association, 146 Mass.,
495; Dimpfel v. Railroad, 110 U. S., 209; Allen v. Wilson (C.
C.), 28 Fed., 677; Boyce v. Coal Co., 37 W. Va., 73; Alexander
v. Searcy, 81 Ga., 536, 545; Peabody v. Flint, 6 Allen, 54; Greg-
ory v. Pachett, 33 Beav., 595; Ashurt's Appeal, 60 Pa., 290;
Watts' Appeal, 78 Pa., 370; Stewart v. Transportation Co., 17
Minn., 372 (Gil., 348) ; Taylor v. Railroad, 4 Woods, 575, 13 Fed.,
152; Railroad v. Railroad, 3 De Gex, M. & G., 341; Smith v.
Clay, 3 Brown Chy., 639.

6. **SAME.** Same. Purchaser of corporation stock cannot
avoid ultra vires acts authorized by his vendor.

The purchaser of shares of stock in a corporation acquires no
greater rights than his vendor possessed, and such purchaser
can not avoid *ultra vires* acts of the corporation authorized by
such vendor, and done before such purchase, or afterwards, as
to liabilities incurred before such purchase and in the necessary
protection of the rights of others arising before such purchase,
when done in pursuance of such previous authority.. (*Post, pp.*
75-79.)

Cases cited and approved: Bert v. British, etc., Association, 4
De Gex & J., 158; Belmont v. Railroad, 52 Barb., 663; Hubbell

McCampbell v. Railroad.

v. Warren, 8 Allen, 173; Railroad v. Collins, 40 Ga., 616; Kent v. Quicksilver Mining Co., 78 N. Y., 159; Rooks v. Railroad, 1 Sn. & C., 142; Graham v. Railroad, 2 McN. & G., 146; Leo v. Railroad (C. C.), 19 Fed., 283.

Cases cited and distinguished: Marble Co. v. Harvey, 92 Tenn., 116; Grant v. Lookout Mountain Co., 93 Tenn., 691; Railroad v. Sneed, 99 Tenn., 1; State v. Mitchell, 104 Tenn., 336.

7. **SAME. Same. Purchaser of corporation stock can avoid ultra vires acts done after institution of suit.**
But the purchaser of stock in a corporation can avoid the *ultra vires* accommodation indorsements made by the corporation for the liabilities of another arising after purchase of the stock and after the institution of his suit to avoid the same and such previous indorsements, though done in pursuance of the authority conferred by vendor and previous stockholder. (*Post, pp.* 79-80.)

FROM KNOX.

Appeal from the Chancery Court of Knox County.— JOSEPH W. SNEED, Chancellor.

SANSOM, WELCKER & PARKER, and GREEN & SHIELDS, for McCampbell.

WEBB, MCCLUNG & BAKER, for Railroad.

MR. CHIEF JUSTICE BEARD delivered the opinion of the court.

The bill in this case was filed by complainant, as a stockholder of the Fountain Head Railroad Company, for the use of herself and all of its other stockholders, against that company, the Knoxville & Fountain City Land Company, and the individual directors of both of these companies (they being the same persons), to set aside a subscription by the railroad company for $100,-000 of the stock of the Knoxville & Fountain City Land Company, and to recover the funds paid by the railroad company to the land company for this stock; also to set aside the indorsement of the railroad company upon something over $300,000 of the notes of the land company, which are payable to or held by George Borgfeldt & Co., a corporation, the shareholders in which constitute the directors of these two companies; and to wind up the Fountain Head Railroad Company, pay its debts, and distribute its assets, on the ground that it had become a business failure because of the alleged fraudulent and illegal diversion of its funds from the legitimate purpose for which it was organized, by the present board of directors, who hold, as is averred, a majority of its stock, and are fraudulently mismanaging its affairs, to their own personal advantage, and to the destruction of the value of complainant's stock.

The pleadings in the case are very voluminous, and it would require very much time to state them with any degree of detail; but, as the finding of facts by the court of chancery appeals sufficiently presents the issues that

were raised by them, we will content ourselves with summarizing it.

From this finding it appears the Fountain Head Railroad Company was chartered under the laws of this State in 1887 for the purpose of constructing and operating a short line from Knoxville to Fountain Head, in Knox county, a distance of some five or six miles.. The charter is in the form prescribed by the statute of Tennessee, and, among other powers, grants to the stockholders and directors that of fixing the capital stock of the company and increasing it at their pleasure.

At first the company was capitalized at $50,000; and stock to this amount was subscribed and paid for by different individuals. Mr. Curtis Cullen, of the firm of Cullen & Newman, of Knoxville, was interested in the enterprise from the beginning; and his firm at a very early date became the owners of 285 shares of the stock of the company, the par value of which was $28,500. In the year 1890, after the road was put in operation, Mr. Cullen conceived the idea that it could be made very much more profitable to the stockholders, if the road itself, or its owners and operators, should buy up the lands lying along its line and near its terminus, at Fountain Head, with a view to a speculative advance in their value. Not having sufficient capital himself, and his firm also lacking it, Mr. Cullen went east in the year 1891, and interested in the scheme the defendant Brady, a citizen of the city of New York. Through him he was introduced to the firm of Borgfeldt & Co., a rich concern engaged in

business in New York City, with wealthy connections in Germany. This firm and their associates, together with Brady, after consideration, determined to go into the scheme with Cullen & Newman. Originally it was agreed these parties should put into the investment $100,000, and Cullen & Newman a like amount, and, to this end, that the capital stock of the railroad company should be increased to $100,000; it being understood the latter parties were to make good their subscription to the increased capital stock with the stock already owned by them in the railroad company, and certain lands of which they represented themselves to be the owners, the aggregate value of the two being estimated at $100,-000. It was also agreed, in order to consummate this scheme, that all the original stock of the railroad company should be bought up and controlled by this syndicate.

To make sure that this plan was one which promised success, Brady, in his own interest and that of his New York associates, came to Knoxville, and there, overlooking the field, became satisfied the venture was a safe one. The matter, however, was submitted to a member of the Knoxville bar, who advised them that the railroad company itself could not buy and hold real estate for the purpose of speculation, and that it would be necessary to procure a charter for a land company, and, upon this being done, that the same end might be accomplished by a subscription of stock in it made by the for-

mer company direct, or indirectly by trustees in its interest. Upon this suggestion a charter was obtained, and the defendant the Knoxville & Fountain City Land Company was organized.

In May, 1891, a meeting of the shareholders of the railroad company was held, at which the by-laws of the company were amended so as to increase the capital stock to $200,000. For this amendment the entire stock of the company present (being 455 shares) voted, and the directors were instructed to offer for subscription 1,500 shares of stock, of the par value of $100 each, with the view of making good this increase. At the same meeting a resolution was offered and adopted directing the board of directors of the railroad company, as soon as the 1,500 shares of additional stock had been subscribed, "to subscribe for and on behalf of the Fountain Head Railroad Co. to the capital stock of the Knoxville & Fountain City Land Co. the sum of $100,000.00, the subscription to be made and the certificates of stock taken either in the name of this company, or in the name of trustees for the use of this company as it may be advised."

On the same day, and at that or a subsequent meeting, books were opened for subscription for these additional shares of capital stock, resulting in a subscription by Cullen & Newman for 700 shares of the new stock, of the par value of $70,000; and by George Borgfeldt and his associates for 800 shares, of the par value of $80,000. This being done, a motion was then made and adopted

directing the president of the company to subscribe to the capital stock of the land company the amount already indicated, and that this subscription be made in the name of trustees for the railroad company; the names of these trustees being set out in the motion, and spread upon the minutes. The subscription thus authorized was at once made.

Cullen & Newman paid for their 700 shares of this new stock as follows; that is to say, they were the owners of 168 acres of land, of which they made a conveyance to the land company. They at the same time gave a check for $70,000 to the railroad company. This check was taken by Mr. Cullen, the president of the company, in full payment of the subscription of the stock of Cullen & Newman; and it was then indorsed by Cullen as president, and turned over to the land company in payment of the railroad company's subscription of $70,000 to the stock of that company, and it was then treated as transferred or was actually transferred by that company to Cullen & Newman in payment of the tract of land above referred to. This check did not represent money. The drawers had no money in bank to meet it, and there was no purpose on their part that it should be presented and paid. Its use was adopted as a simple method to consummate the transaction. Cullen, the president of the railroad company, as has been seen, took the check in discharge of the subscription of Cullen & Newman to the stock of that company. He then delivered it to the land company in part payment of the subscription of

stock made in the name of the trustees for the benefit of the railroad company; and then it was turned over to Cullen & Newman by this latter company, and discharged the obligation of the land company to Cullen & Newman upon the conveyance of the land. This method of cancelling indebtedness by an interchange of credits was understood by all of the parties, and was contemplated as a part of the scheme.

At the time of this transaction, Cullen & Newman had already bought up and controlled, for themselves and George Borgfeldt and associates, all of the original stock of the railroad company, or afterwards acquired it, though it appears that in these meetings only $45,500 out of the $50,000 of this stock were present and voted.

The certificates of stock issued by the land company in the name of the trustees appointed on behalf of the railroad company have since been held by them for the benefit of that company.

We have already seen how $70,000 of this subscription to the land company stock was paid. The balance of the subscription (that is, $30,000) was paid in cash; this being a part of the $80,000 paid by Borgfeldt and his associates to discharge their liability for the $80,000 of the new stock which they took of the capital stock of railroad company.

All this was done under the management of Mr. Curtis Cullen, to whom control was largely delegated by Borgfeldt and his associates; they having, as is evident, entire confidence in his integrity and business ability.

At the time this was done it was understood by Borg-feldt and his associates that Cullen & Newman were the owners of four hundred and fifty acres of land, which was to be turned over to them by the land company. It turned out, however, that they only owned and conveyed to that company, as has been before stated, one hundred and sixty-eight acres. It was also understood by these gentlemen that Cullen & Newman were to put in these lands at actual cost. It subsequently turned out, however, that they were turned over to the land company at double the amount they cost them. This produced a disagreement between Cullen & Newman and Borgfeldt and his associates, the result of which was that Cullen & Newman were required to disgorge their $25,000 or $30,000 of the $70,000 of new stock that had been issued to them. This fact, however, has no material bearing on this litigation, and need not be further followed.

As has already been stated, Borgfeldt and his associates paid into the treasury of the railroad company $80,-000 for their stock, and that of this amount $30,000 was used in paying on the subscription of stock by that company to the land company. The remainder of this cash payment was used by the railroad company in purchasing new engines and paying outstanding liabilities of the railroad company, and in other ways, needless to mention.

As has been already seen, there was $4,500 of the original stock of the railroad company, which seems not to

have been represented at the meetings of the share-
holders held in May, 1891, when these various trans-
actions were resolved upon; but the court of chancery
appeals finds that all the stock was then owned and con-
trolled by Cullen & Newman and by Borgfeldt and his
associates, or was soon after acquired by them, and that
all of this stock assented to these transactions as made;
that afterwards all of the original certificates of the
$50,000 of stock were surrendered, and new certificates
issued and accepted in their places.   That court further
finds that "when the subscription, after the increase of
the capital stock to $200,000, was made by the railroad
company to the stock of the land company, it was as-
sented to by the holders of all the stock of the railroad
company, and that this latter company had subscribed
for and taken all the stock of the land company, so that
the entire transaction was, as a matter of fact, under-
stood by all the stockholders of the railroad company,
and was agreed to or afterwards ratified by all the stock-
holders of the railroad company, when this subscription
was made, so that the whole transaction was one of
unanimous consent by all the stockholders of the rail-
road company, both old and new."

The result of these transactions, instead of being prof-
itable, as was anticipated by the parties engaged in them,
proved to be disastrous.   The land taken from Cullen
& Newman, or afterwards purchased through them, cost
the land company $235,000,   The operations of the rail-

road company were evidently not profitable. The land boom which existed at the time the land company was formed soon collapsed. The indebtedness of both companies seems rapidly to have increased. Both alike in their financial stress looked to, and were relieved by advances made by, George Borgfeldt and his associates, until at the time of the filing of the present bill the railroad company was indebted to these parties, as is alleged, in something like $40,000, and the indebtedness of the land company to them amounted to something over $300,000. This latter indebtedness grew out of the fact that these parties were compelled to furnish the money to pay the purchase price of the new lands bought by the land company, and to remove incumbrances on these lands, as well as on those turned over to the company by Cullen & Newman, and to pay for improvements of the railroad properties.

From the time of the organization of the land company, the two companies have had the same boards of directors, and they have been regarded by the stockholders and directors of each as being in a large measure one. So close has been the relationship of these companies, that beginning as early as February, 1892, the Knoxville & Fountain City Land Company was authorized by its shareholders to issue demand notes to raise money to meet its liabilities, and the Fountain Head Railroad Company was authorized by its shareholders to indorse these notes; and it has turned out that at the filing of this bill the railroad company, in addition to its own

McCampbell v. Railroad.

legitimate debts, was also liable as indorser upon all the paper issued by the land company to Borgfeldt and his associates for money advanced by them for the benefit of that company, amounting to the large sum set out above.

In the year of 1896 the firm of Cullen & Newman failed, and about this time they transferred the stock held by them in the railroad company to the complainant and other intervening petitioners, to be held by them as collateral to secure their debts.     While thus pledged, none of it was transferred on the books of the company until a short time before the filing of the bill in this case, in the year 1900, and some of it was only transferred after the bill was filed.    All this time, while these transactions were going on, this stock stood in the names of Cullen & Newman, and was voted by them as their own in the various meetings that were held, authorizing or approving these various transactions.   Shortly before the bringing of the present suit, some of these parties, under the power given them in their pledges, sold the stock and bought it in, and others pursued this method after its institution.    Upon these facts, there can be no doubt that in subscribing for stock in the land company the railroad company exceeded its charter powers, and was guilty of an *ultra vires* act, and this is not altered by the facts that this subscription was made in the names of trustees for the company. And we think there is as little doubt that, with proper parties before the court, this subscription of stock would be canceled, and the land company would be compelled to pay back whatever

amount of money it received from the officers of the railroad company in discharge of this unauthorized and illegal subscription. And it is also true it is well settled as a rule of law, in the absence of express or necessarily implied power given in the charter, that one corporation cannot indorse paper for the accommodation of another, so that, at the instance of parties not disqualified to act, a court of equity would in this case relieve the railroad company from liability on the indorsements of the paper issued by the land company, now held by George Borgfeldt and his associates. The question is, are the complainants in an attitude to ask for such relief?

In addition to the above rules of law in regard to the charter powers of corporations, which are so well settled that they scarcely need a citation of authority, there is another principle which is equally clear, and that is that courts of equity are prompt to redress the injuries of minority stockholders against the wrongdoing of majorities; and, in view of the relations which exist between them and the corporation and its officers, the general rule is they are bound to seek their remedy through the corporation at a meeting of its shareholders, or by application to those in charge of its affairs. If relief cannot be obtained by either of these methods, then they themselves can come into equity seeking it. The only exception to the rule requiring the minority stockholders to proceed thus before they institute proceedings in behalf of themselves and their stockholders is when it appears that to seek such relief through these regular channels

would be an idle ceremony.  *Hawes* v. *Oakland,* 104 U.
S., 450, 26 L. Ed., 827; *Detroit* v. *Deane,* 106 U. S., 537, 1
Sup. Ct., 560, 27 L. Ed.; 300.

It may be conceded, in view of this exception to the
general rule, upon the averments of the present bill, as
well as the case made out by the testimony, that redress,
if obtainable at all by the complainant and the interven-
ers, could only be secured by a bill such as the present
one. So it may be said that, if the complainant and these
interveners are entitled to a status in court, they have
made good their right to it.

Treating this case as if Cullen & Newman had filed the
present bill, or that these complaining parties occupy no
higher ground than would Cullen & Newman, in view of
the facts found by the court of chancery appeals, are
they entitled to the relief sought at the hands of the
chancellor?  From the facts already stated, we have
here a case where the parties complaining, by their ac-
tive co-operation with all the other stockholders of the
railroad company, brought about the *ultra vires* compli-
cation from which they now seek to be relieved.   Will
their complaint be listened to?   In Green's Brice's
Ultra Vires, p. 783, mere acquiescence in unauthorized
and illegal transactions will be, it is said, sufficient to
repel complaining stockholders.   That author uses these
words:   "If an act be *ultra vires,* a corporation may
raise the objection, whether against a corporation or
against a creditor or other contracting party attempting
to enforce such act, or his alleged claims or rights re-

sulting therefrom. But if an incorporator desire protection against the party who has thus dealt with the corporation, he must have been prompt and energetic in repudiating the transaction, as he can be bound by acquiescence. So, if he do not quickly object, and give his objection vitality, the creditor will be justified in answering that he consents."

Mr. Cook, in his work on Corporations (volume 2, section 730), says: "After a stockholder has knowledge of an *ultrà vires,* fraudulent, or negligent act of the directors, he must institute his suit, if at all, within a reasonable time thereafter. As to what will constitute a reasonable time, depends on the circumstances of the case. If it is evident that the stockholder is waiting to see whether the unauthorized act will be profitable to the corporation, the court will refuse to grant him any relief. So, also, if a stockholder, after a full knowledge of the facts, stands by and allows large operations to be completed or money expended or alterations to be made before he brings suit, he is guilty of laches, and his remedy is barred. In like manner, where the stockholder, with full knowledge, has accepted the benefit of the act, he cannot complain thereafter; and, in general, where it is clear that the stockholder had a full knowledge of all the essential facts of an act which he might bring a suit to remedy, but which for an unreasonable length of time he fails to object to by a bill in equity, he will be held guilty of laches, and his right to institute his suit is barred."

Mr. Clark, in his condensed, but valuable work on Corporations (Hornbook Series), on this subject, says: "Stockholders may be precluded by acquiescence, laches, or estoppel from bringing suit to redress injuries to the corporation by the directors or other officers, or by the majority of the stockholders, or by a third person, for such suits are subject to the familiar principle of equity jurisprudence that acquiescence in a course of conduct by one interested in it especially when the rights of others are effected thereby, will induce the court to refuse him relief. . . . Thus it was held . . . that a stockholder could not bring suit for improper investments of corporate funds made three years before, if he knew them at the time and did not object; and it has often been held that a stockholder is estopped to object to corporate acts done with his consent." To this text the author cites *Dunphy* v. *Association,* 146 Mass., 495, 16 N. E., 426; 1 *Cumming,* Cas. Priv. Corp., 769; *Dimpfel* v. *Railroad,* 110 U. S., 209, 3 Sup. Ct., 573, 28 L. Ed., 121; *Allen* v. *Wilson* (C. C.), 28 Fed., 677; *Boyce* v. *Coal Co.,* 37 W. Va., 73, 16 S. E., 501; *Alexander* v. *Searcy,* 81 Ga., 536, 8 S. E., 630, 12 Am. St. Rep., 337; *Peabody* v. *Flint,* 6 Allen, 54; *Gregory* v. *Patchett,* 33 Beav., 595; *Ashurst's Appeal,* 60 Pa., 290; *Watts' Appeal,* 78 Pa., 370; *Stewart* v. *Trans. Co.,* 17 Minn., 372 (Gil. 348).

In 2 *Beach on Priv. Corp.,* section 887, the rule is announced in these words: "The right to redress corporate acts ceases when the members have consented to the will of the majority." Mr. Morawetz (on Corp., in sec-

tions 261, 262, 267, 623-625) lays down the same rule, as does also Judge Thompson in the fourth volume (sections 4569 and 4571), and Mr. Taylor in sections 275-281, of their several works on corporations.

In *Alexander* v. *Searcy,* 81 Ga., 545, 8 S. E., 630, 12 Am. St. Rep., 337—a suit instituted by minority stockholders complaining of *ultra vires* acts—it was held that where notice of purchasers of stock of another corporation was had by the directors and stockholders, and the purchasing corporation regularly voted the stock, and had expended large sums of money for the benefit of the corporation under resolution of its stockholders, after from seven to fifteen years from the date of the purchase a court of equity would not listen, among other things, to the complaint of the minority stockholders that, being a corporation, it had no power under its charter to make such purchase.

In *Taylor* v. *Railroad,* 4 Woods, 575, 13 Fed., 152, the court says: "A stockholder of a corporation will not be allowed, after an unreasonable time, to disturb or rescind a contract made by his corporation after the same has been fully executed, on the ground that it is *ultra vires* and in excess of the corporate powers granted by the charter of the corporation." And in *Stewart* v. *Transportation* Co., 17 Minn., 372 (Gil. 348), the court says: "If a stockholder assents to acts *ultra vires,* or, although not originally or expressly assenting, has for an unreasonable time acquiesced, and has permitted them to go unquestioned, so that other parties who have

McCampbell v. Railroad.

acted upon the faith of them (as, for instance, by making large appropriations of money) would suffer great injury from their repudiation, a court of equity would not be easily induced to grant relief at the instance of such stockholders." In *Peabody* v. *Flint,* 6 Allen, 54, an acquiescence and delay of three and one-half years was held to be a bar to such relief; in *Gregory* v. *Patchett,* 33 Beav., 595, six years were held to be a bar; and in *Ashurst's Appeal,* 60 Pa., 290, seven years were held to be a bar; and in *Dimpfel* v. *Railroad,* 110 U. S., 209, 3 Sup. Ct., 573, 28 L. Ed., 121, three years and eight months were held to be a bar.

As was well said by the court in *Alexander* v. *Searcy,* supra: "The general rule we deduce from the authorities . . . is that while a minority of the stockholders of a corporation may maintain a bill in equity in behalf of themselves and their stockholders for fraud, conspiracy, or acts *ultra vires* against the corporation, its officers, and others who participated therein, when the minority stockholders have been injured or damaged by said acts, they must act promptly, and not wait an unreasonable length of time. If they postpone their complaint for an unreasonable length of time, they forfeit their right to equitable relief."

In *Railroad* v. *Railroad,* 3 De Gex, M. & G., 341, it is said: "Where the summary interference of this court is invoked in cases of this nature, it must be invoked promptly. Parties who have lain by and permitted a large expenditure to be made in contravention of the

rights for which they contend cannot call upon this court for its summary interference." And in *Smith* v. *Clay,* 3 Brown, Ch., 639, it was announced that "nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing."

In the *Alexander* v. *Searcy* case, above quoted from, the same argument is made as in the case at bar; that is, that no amount of acquiescence on the part of the stockholders will make an act legal which is illegal; in other words, that no amount of acquiescence on the part of the stockholders would give power to the Fountain Head Railroad Company to purchase and own stock in the land company, or to indorse its paper, in the absence of a law authorizing it. To this argument that court replied, as we think properly: "We concede that, but, in our opinion, it does not follow that, because a railroad company has no power to purchase or own stock in another railroad company, a stockholder who has acquiesced therein for fifteen years should have a right to object. It may be true, and doubtless is, that no assent or acquiescence of the stockholders can validate such an act; but it is a different question whether, after a long acquiescence, the stockholders may take advantage of the invalidity of such acts. The act of purchasing and owning and voting stock in any railroad company by another railroad company may be *ultra vires* so far as the public are concerned, but we do not think that a stockholder who has acquiesced for fifteen years, and who has

McCampbell v. Railroad.

received money from the corporation by reason of the illegal act, should be allowed to make that question. His acquiescence does not render valid the illegal act of the corporation, but will prevent him from taking advantage of its invalidity. The public or the State is not so bound. The State, through its proper officers, may at any time commence proceedings to prevent it, or declare it *ultra vires* or illegal." If it be true that mere acquiescence or laches will preclude a stockholder from making such question, then what show of right has a holder of stock, who has from time to time given his consent in open meeting to the doing of the acts of which he now complains?

Nor do the transferees of stock, such as are the complainant and the interveners in this suit, stand in any other or different position from Cullen & Newman. Mr. Morawetz, at section 267, vol. 1, of his work on Corporations says: "A purchaser of shares acquires no greater rights than the prior holder. If a violation of the corporate rights is acquiesced in by all the other holders of stock, the action becomes extinguished thereby, and no other holders, present or future, would be entitled to complain." And again, in section 265, the same author says: "A shareholder who has acquired his shares after an unauthorized transaction had taken place certainly cannot place his complaint on the ground that he has suffered a wrong, or that his equitable rights have been infringed. Under these circumstances, a plaintiff's cause of action, if he have any, is derived by purchase

and transfer from the holder of the share." And in sec-
tion 264 it is said: "If it appears in the progress of a
suit that the complainant is personally disqualified from
suing, the suit cannot proceed, although the other share-
holders are entitled to relief. As, on the one hand, the
plaintiff who has the right to complain of an act done to
a numerous society, of which he is a member, is entitled
to sue on behalf of himself and of others similarly inter- '
ested, although no other may wish to sue. So, although
there be a hundred who wish to institute a suit, and are
' entitled to sue, still, if they sue by a plaintiff who has
personally precluded himself from suing, that suit can-
not proceed."

These texts of the author are supported by authorities
of the greatest weight. Among them are to be found *Bert*
v. *British, etc., Ass'n,* 4 De Gex & J., 158; *Belmont* v.
*Erie Ry. Co.,* 52 Barb., 663; *Hubbell* v. *Warren,* 8 Allen,.
173; *Central Railroad* v. *Collins,* 40 Ga., 616; *Kent* v.
*Quicksilver Mining Co.,* 78 N. Y., 159.

"It is true," says Mr. Morawetz in section 263, "a
shareholder who has acquiesced in an unauthorized act
is not bound to submit to all future acts of a similar
character, nor is a shareholder who has acquiesced in the
making of an unauthorized and illegal contract neces-
sarily precluded from applying to the courts to redress
its performance; . . . but the courts are entitled
to exercise a wide discretion in cases of this description.
They should certainly not allow a shareholder to change
his mind, and apply for an injunction to redress the per-

formance of a contract to which he had previously consented, in any case in which this would be unfair to other persons." Citing *Rooks* v. *S. W. Ry. Co.,* 1 Sm. & C., 142; *Graham* v. *Burkenhead Ry. Co.,* 2 McN. & G., 146; *Leo* v. *U. P. Ry. Co.,* [C. C.] 19 Fed., 283.

While, under authority of the rule stated in this last quotation, we think that the parties complaining in this suit would be entitled to relief as against similar acts to those passed which they seek to set aside, done after a reasonable protest against their repetition, yet neither under it nor any other authority to which we have referred in the course of this opinion, nor under any to which our attention has been called in the course of argument, can they ask to be relieved from liability incurred or acts done before the filing of their bill, either with their sanction, or that of the transferrers of the stock which they now hold. But it is insisted that, whatever may be the state of the law elsewhere, our own cases are contrary to this ruling. We think, however, an examination of them does not support this insistence, and that no one of them announces a principle that is in conflict with the rule of fairness and right which precludes a party from attacking successfully a corporate act, however unauthorized it may be, to which he has given his consent, or in which there has been an acquiescence for the length of time disclosed in this record.

In *Marble Co.* v. *Harvey,* 92 Tenn., 116, 20 S. W., 427, 18 L. R. A., 252, 36 Am. St. Rep., 71, there was an effort by a corporation to enforce an *ultra vires* contract as

against the other party to this contract; and it was held, and properly, that such a suit could not be maintained. In the case of *Grant* v. *Lookout Mountain Co.,* 93 Tenn., 691, 28 S. W., 90, 27 L. R. A., 98, it was simply held that a corporation is liable for reasonable attorney's fees incurred in the succesful prosecution of a just and necessary suit by a minority of its stockholders against itself, its officers or directors, for the benefit of the company, to enjoin the fraudulent disposition of its properties, or to recover properties already fraudulently transferred, and that the attorneys successfully prosecuting the suit were entitled to a lien upon the property recovered therein.   In such a suit the judicial machinery of the court is set in motion by the dissenting shareholders for the benefit of the corporation, and the final relief, when obtained, belongs to the corporation, and not to the stockholder plaintiff.   That case, however, is to be distinguished from this, in that the minority shareholders thus suing had never disqualified themselves, either by consent actually given, or long acquiescence in the acts of fraud of which they made successful complaint.   In *Railroad* v. *Sneed,* 99 Tenn., 1, 41 S. W., 364, 47 S. W., 89, an effort was made to hold the defendant on a subscription to an *ultra vires* and unlawful increase of the capital stock of a railroad company; and it was ruled that although the defendant had been a director in the company by virtue of this stock, and paid up a large portion of his subscription, yet the contract would not be enforced against him or his representa-

tives. As will be seen, this was an effort to enforce performance by the corporation itself of a contract which it had no right to make. The case of *State* v. *Mitchell*, 104 Tenn., 336, 58 S.W., 365, we think, has no bearing on the question we have been discussing.

So it is we are constrained to hold, upon the whole case, the complainant and the interveners, occupying the position they do, are not entitled to the decree which they seek by their bill. They cannot follow the funds of the railroad company into the real estate acquired by the land company; nor are they entitled to a decree against the managing owners of the railroad company for investing its capital in the stock of the land company, nor to a decree relieving the railroad company from its liability upon indorsements of the paper of the land company held by Borgfeldt and his associates at the time of the institution of this suit. The court of chancery Appeals held that they were entitled to have these two companies disassociated, and the relations between them dissevered; and, to this end, that court decreed that the stock held by the railroad company in the land company should be sold, and its proceeds paid into the treasury of the former company. This relief was not contemplated by the bill, and is in the face of the logic of this opinion, yet, as no complaint was made of this part of the decree by either party, we are disposed to affirm it, and direct its execution, if complainant desires it. We think, however, that, under the authority of the rule announced in section 263 of Morawetz on Corporations,

set out in full in a former part of this opinion, that complainant and the interveners are entitled to be relieved from liability incurred by the railroad company in the indorsement of the paper of the land company made since the institution of this suit, where that paper embraced new debts incurred by the latter company with Borgfeldt and his associates, but that, so far as these indorsements cover liabilities which were incurred before the filing of the bill, they are entitled to no such relief.

The case will be remanded, if appellants so desire, with a view of effectuating a sale of the stock before referred to, under the orders of the chancellor, and also for the purpose of stating an account between the railroad company and Borgfeldt and his associates, with a view of ascertaining the liability of the company to them for advances made for its benefit, and also with a view of eliminating from the indorsed paper all sums advanced by Borgfeldt and associates to the land company since the filing of the present bill, embraced in any indorsed paper now held by them, and of any usury that may be found in the various claims of Borgfeldt and associates. We agree with the court of chancery appeals that no case is made out which would authorize a court of equity to take the management of the railroad company out of the hands of the majority stockholders, or to wind it up as an insolvent corporation.

With the modifications indicated above, the decree of that court is affirmed.