# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 1, 2003 Session

## MELINDA ANDERSON, ET AL. v. BRETT WILDER, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-778-01     Harold Wimberly, Jr., Judge**

**<u>FILED NOVEMBER 21, 2003</u>**

**No. E2003-00460-COA-R3-CV**

---

This case involves a dispute between members of a limited liability company ("LLC") entitled FuturePoint Administrative Services, LLC. The Plaintiffs were expelled from the LLC by a vote of the Defendants, who together owned 53% of FuturePoint. The Plaintiffs received a buyout price of $150.00 per ownership unit in FuturePoint after they were expelled, pursuant to the operating agreement of the LLC. Shortly after the expulsion, the Defendants sold 499 ownership units, amounting to a 49.9% interest in the LLC, to a third party at a price of $250.00 per ownership unit. Plaintiffs filed this action, alleging, among other things, that the Defendants' actions violated their fiduciary duty and duty of good faith to Plaintiffs. Defendants moved for summary judgment, arguing that their actions were authorized by the operating agreement and that they acted in good faith in expelling the Plaintiffs. The Trial Court granted summary judgment in Defendants' favor. We vacate the order of summary judgment and remand.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Brian C. Quist, Knoxville, for the Appellants, Melinda Anderson, Alan B. Zimmerman, Cherry W. Zimmerman, Charles F. Quade, Janine R. Quade, William Thompson & Associates, Inc., Michael A. Atkins, Sherry Lynn Turner, and Patrick L. Martin

Lewis S. Howard, Jr. and Heather R. Gunn, Knoxville, for the Appellees, Brett Wilder, Dee Dee Wilder, Michael E. Cox, Lamarr Stout, Anna Stout, Timothy Welles, Kelly Welles, Dennis Freeman, and Rhonda Shockley

## OPINION

FuturePoint Administrative Services, LLC, was created by the parties on or about January 1, 2000, at which time they executed the operating agreement for the company. FuturePoint

commenced the business of administering third party medical claims in early 2000. Ownership of the company was divided into "ownership units." One ownership unit amounted to one-tenth of one percent ownership of the company. The ownership interest, and amount of capital contributed for the startup of FuturePoint, of each party is illustrated in the following chart:

| Member Name | Ownership Interest | Capital Contributed |
| --- | --- | --- |
| William Thompson & Associates, Inc. (Plaintiff) | 100 units (10%) | $15,000 |
| Charles and Janine Quade (Plaintiffs) | 100 units (10%) | $15,000 |
| Michael Atkins and Sherry Turner (Plaintiffs) | 100 units (10%) | $15,000 |
| Patrick L. Martin (Plaintiff) | 100 units (10%) | $15,000 |
| Alan and Cherry Zimmerman (Plaintiffs) | 40 units (4%) | $ 6,000 |
| Melinda Anderson (Plaintiff) | 30 units (3%) | $ 4,500 |
| | | |
| Brett and Dee Dee Wilder (Defendants) | 200 units (20%) | -0- |
| Michael E. Cox (Defendant) | 100 units (10%) | $15,000 |
| Lamar and Anna[1] Stout (Defendants) | 100 units (10%) | $15,000 |
| Timothy and Kelly Welles (Defendants) | 100 units (10%) | $15,000 |
| Dennis Freeman and Rhonda Shockley (Defendants) | 30 units (3%) | $ 4,500 |

As can be seen from the chart, each member contributed $150.00 per ownership unit, with the exception of Defendants Brett and Dee Dee Wilder.

The parties set up FuturePoint as a member-managed LLC. The operating agreement provides for a management committee "to oversee and manage the business operations of the Company." The operating agreement gives the management committee the power and authority to contract on behalf of the company by a majority vote. FuturePoint's management committee was comprised of Plaintiffs Michael Atkins, Charles Quade, and Bill Thompson, and Defendants Lamarr Stout and Brett Wilder.

On September 10, 2001, a members' meeting took place at the FuturePoint offices, at which two offers to purchase ownership units were discussed. Each offer was at a price of $250.00 per ownership unit. At this time, FuturePoint had generated an amount of excess cash on hand in the amount of $63,000.00.

On September 14, 2001, the following actions were taken by the Defendants, as shown by a document styled "Actions taken by written consent of the members of FuturePoint Administrative Services, LLC":

---

[1]Anna Stout was incorrectly identified in the complaint as "Susan Stout." Lamarr Stout, her husband, stated in his deposition that his wife goes by the nickname Susie, which presumably was the source of the error.

In lieu of a meeting of the Members of FuturePoint Administrative Services, LLC (the "Company"), a Tennessee limited liability company, in accordance with the provisions of Section 48-233-101 of the Tennessee Limited Liability Company Act and Article 8.10 of the Operating Agreement of the Company, Members holding a majority of Units and who own Governance Rights with voting power equal to the voting power that would be required to take the same action at a meeting of the Members at which all Members are present hereby take the following actions:

The following Resolutions are hereby adopted by vote of the aforesaid Members:

RESOLVED, pursuant to Article 13.6 of the Operating Agreement of the Company, the following Members are hereby expelled from the Company effective as of the date hereof:

William Thompson & Associates, Inc.
Mike A. Atkins and/or Sherry Lynn Turner
Patrick L. Martin and/or Deborah N. Martin
Charles F. Quade and/or Janine R. Quade
Melinda Anderson and/or Adam & William Derreberry
Alan Zimmerman and/or Cherry W. Zimmerman

RESOLVED FURTHER, pursuant to Article XVII of the Operating Agreement of the Company, the Operating Agreement is hereby amended to delete in its entirety, Article IX and the Management Committee created thereunder; such functions previously conducted by the Management Committee to be hereafter conducted by the Chief Manager, Brett Wilder.

RESOLVED FURTHER, pursuant to Article X of the Operating Agreement, Charles F. Quade is hereby removed as Secretary of the Company and Lamarr Stout is hereby elected as Secretary of the Company.

Pursuant to the terms of the operating agreement, the remaining members of the company bought the ownership interests of the expelled members at a price of $150.00 per membership unit. On October 11, 2001, the remaining members of FuturePoint sold a total of 499 membership units to a Don Allen at a price of $250.00 per unit.

The Plaintiffs brought this action on December 17, 2001, alleging breach of fiduciary duty and breach of the statutory and common law duty of good faith and fair dealing. Defendants moved

for summary judgment, arguing that their actions were expressly permitted under the operating agreement, and that they acted in good faith in expelling the Plaintiffs. Specifically, Defendants relied upon the following provision of the operating agreement:

> 13.6  Expulsion of a Member.  The Company may expel a Member, with or without cause, from the Company upon a vote or written consent of the Members who hold a majority of Units.  In the event of a Member's expulsion, the remaining Members shall be obligated to purchase the expelled Member's Financial Rights at the Agreed Price and on the Agreed Terms within thirty (30) days of such expulsion.  The remaining Members shall purchase the expelled Member's Financial Rights in proportion to their Financial Rights (excluding the Offered Financial Rights), or in such other proportion as they may agree.

The Trial Court granted the Defendants summary judgment, finding only that "no genuine issues of material fact exist for adjudication and the Defendants are entitled to summary judgment as a matter of law."  Plaintiffs have appealed this ruling, raising the issue, which we restate, of whether the Trial Court erred in granting summary judgment.

In *Staples v. CBL & Associates, Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000) the Tennessee Supreme Court stated the following as to the standard of review specifically applicable to summary judgments:

> The standards governing the assessment of evidence in the summary judgment context are also well established.  Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d at 210-11.  Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion.  *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

We begin with the Plaintiffs' assertion that the majority shareholders in a member-managed, closely-held LLC stand in a fiduciary relationship to the minority shareholders, such as Plaintiffs in this case.  We quote from Plaintiffs' brief as follows in summarizing their argument in this regard:

> [I]t is well settled in Tennessee that the majority shareholders of a corporation owe a fiduciary duty to the minority shareholders. *Nelson v. Martin*, 958 S.W.2d 643, 647 (Tenn.1997); *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 793 (Tenn.1996); *Nelms v. Weaver*, 681 S.W.2d

-4-

547, 549 (Tenn.1984); *Dale v. Thomas H. Temple Co.*, 208 S.W.2d 344, 352 (Tenn.1948). While corporations are "fictional" entities created by statute, the fiduciary duty of the majority shareholders to the minority is a matter of common law. The Tennessee Business Corporation Act at T.C.A. § 48-11-101 et seq. mentions nothing about any fiduciary duty owed by majority shareholders to minority shareholders. Accordingly, why should the majority members of a member-managed limited liability company not owe the same fiduciary duty to the minority? They should. There is no reason to distinguish the two forms of business enterprise. Indeed, member-managed limited liability companies are governed more like partnerships than conventional corporations. Since it is also well established as a fundamental rule of partnerships, that <u>all</u> partners, not just the majority, owe each other fiduciary duties (*Lightfoot v. Hardaway*, 751 S.W.2d 844, 849 (Tenn.Ct.App.1988)), it logically follows that a majority of the members of an "LLC" should owe a fiduciary duty to the minority members just like the duty a majority of the shareholders of an "Inc." owe the minority shareholders.

An analysis of the nature and history of the limited liability company is helpful in addressing this fiduciary duty question. The LLC is a relatively new form of business entity, a hybrid which "incorporates certain beneficial aspects of a partnership with certain beneficial aspects of a corporation." Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689. This A.L.R. annotation contains the following helpful observations:

> It is important to keep the history of LLC development in perspective when working with LLCs and court interpretations of LLC acts.
> . . . The typical LLC act is usually a hybrid of provisions culled from the individual state's partnership statutes and business corporation law.
>
>    *        *        *
>
> [W]hen a court is interpreting an LLC act or agreement, the court will focus on the particular aspect of the LLC that gives rise to the problem, with emphasis on the foundational business form from which that characteristic originated. Usually, the particular aspect can be traced to either the corporate components or the partnership components of the LLC act or agreement. In such cases where the characteristic originated from the partnership aspects of the LLC, the court will use the established princip[le]s and precedent of the partnership law to resolve the issue. . .In such cases where the characteristic originated from the corporate aspects of the LLC, the court will utilize the established princip[le]s and precedent of corporate law to resolve the issue.

79 A.L.R.5th at page 698.

It is well-recognized that a fiduciary relationship exists between members of either a partnership or a closely-held corporation under established principles of both partnership law and

corporate law. In *Lightfoot v. Hardaway*, 751 S.W.2d 844 (Tenn.App.1988), the court stated as follows regarding business partnerships:

> The fundamental rule that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith and integrity in their dealings with one another with respect to partnership affairs is universally recognized in the modern cases and is reinforced by the Uniform Partnership Act.... Also well established is the applicability of this fiduciary duty on the sale of one partner's interest to another partner, the courts often characterizing the duty as being "particularly" or "especially" applicable to this situation. Although it is no longer disputed, at least in theory, that such a sale will be sustained only when it is made in good faith, for a fair consideration, and on a full and complete disclosure of all important information as to value, the rule's application is by no means as clear and simple as its statement; and the specific content of such terms as "good", "fair", "full", and "important" can be known only by relating the particular conduct and circumstances of the parties to the results reached in the cases.

*Lightfoot*, 751 S.W.2d at 849 (quoting 4 A.L.R.4th at page 1128-29). The General Assembly has clarified the duties owed by partners by passage in 2001 of T.C.A. 61-1-404, which provides in relevant part as follows:

> (a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c).
>
> (b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:
>
> (1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;
>
> (2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and
>
> (3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.
>
>              \*                \*                \*

(d) A partner shall discharge the duties to the partnership and the other partners under this act or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

(e) A partner does not violate a duty or obligation under this act or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

The Supreme Court has provided the following guidance as regards members of corporate associations:

> This Court has stated that majority shareholders owe a fiduciary duty to minority shareholders. *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 793 (Tenn.1996); *Nelms v. Weaver*, 681 S.W.2d 547, 549 (Tenn.1984), *cert. denied*, 476 U.S. 1118, 106 S.Ct. 1976, 90 L.Ed.2d 660 (1986); *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344, 352 (1948). The Court of Appeals stated in *Johns v. Caldwell*, 601 S.W.2d 37 (Tenn.App.1980), "Our courts are prompt to redress the injuries to minority stockholders caused by the wrongdoings of majority stockholders." *Id.* at 41 (citing *McCampbell v. Fountain Head Railroad Co.*, 111 Tenn. 55, 77 S.W. 1070 (1903)).
>                   *                   *                   *
> In *Intertherm v. Olympic Homes Systems*, 569 S.W.2d 467 (Tenn.App.1978), the court noted that the transactions of majority or dominant shareholders will be closely scrutinized for good faith and fairness if challenged. The court stated that it would "apply the rule of close scrutiny and place the burden on the shareholder to justify a transaction with his corporation only when the shareholder owns a majority of stock, or is shown to dominate or control the corporation to a significant degree in some other way." *Id.* at 472.
> *                   *                   *
> The Court has not addressed specifically the issues presented in this case, the relationship between shareholders in a close corporation where there is no majority or dominant shareholder and the dispute relates to the shareholders' interests as shareholders. The Court of Appeals relied upon the decision in *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657 (1976), in which the Massachusetts court held there is a fiduciary relationship between shareholders of a close corporation. In *Wilkes*, the Court stated that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners

-7-

owe to one another." *Id.* 353 N.E.2d at 661 (quoting *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975)). That standard of duty is one of "utmost good faith and loyalty."

\* \* \*

Based on these principles, [defendants] Martin and Gammon, together and separately, were obligated to deal fairly and honestly with [plaintiff] Nelson and could not act out of avarice, malice, or self-interest in violation of their fiduciary duty to him as a shareholder.

*Nelson v. Martin*, 958 S.W.2d 643, 647-49 (Tenn.1997), *overruled in part on other grounds* by *Trau-Med of America, Inc. v. Allstate Ins. Co.,* 71 S.W.3d 692 (Tenn.2002).

Defendants in the present case argue that an LLC is a "creature of statute" and because the LLC Act, found at T.C.A. 48-201-101 *et seq.*, does not specifically prescribe a fiduciary duty of majority shareholders to a minority, this Court should not recognize such a duty. Defendants cite the case of *McGee v. Best*, 106 S.W.3d 48 (Tenn.App.2002) in support of their argument. The *McGee* court stated as follows regarding the LLC Act:

The statute in question defines the fiduciary duty of members of a member-managed LLC as one owing to the LLC, not to individual members. We cannot contravene the intent of the Legislature.

McGee, 106 S.W.3d at 64. The *McGee* case was in essence an employment dispute and did not involve an allegation of oppression by a majority shareholder group. The *McGee* Court noted that "this case boils down to a rather uncomplicated dispute controlled by the employment contract and the Operating Agreement. . .The only issue involved is whether termination of the employment was for cause." *McGee*, 106 S.W.3d at 67.

The statute at issue here is T.C.A. 48-240-102, and it provides in pertinent part as follows:

(a) FIDUCIARY DUTY OF MEMBERS OF MEMBER-MANAGED LLC. Except as provided in the articles or operating agreement, every member of a member-managed LLC must account to the LLC for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the formation, conduct, or liquidation of the LLC or from any use by the member of its property including, but not limited to, confidential or proprietary information of the LLC or other matters entrusted to the member as a result of such person's status as a member.

(b) STANDARD OF CONDUCT. A member of a member-managed LLC shall discharge such member's duties as a member, including all duties as a member of a committee:

(1) In good faith;

(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) In a manner the member reasonably believes to be in the best interest of the LLC.

Pursuant to the above analysis, we are of the opinion that finding a majority shareholder of an LLC stands in a fiduciary relationship to the minority, similar to the Supreme Court's teaching in *Nelson* regarding a corporation, is warranted in this case. Such a holding does not conflict with the statute, and is in keeping with the statutory requirement that each LLC member discharge all of his or her duties in good faith.

We now turn to the question of whether Defendants' actions, viewed in the light most favorable to Plaintiffs under our summary judgment standard, could reasonably be said to have violated their fiduciary duty of dealing fairly and honestly with the minority Plaintiffs, and acting in good faith toward them.

In support of their motion for summary judgment, Defendants Mr. Wilder, Mr. Cox, Mr. Stout, Mr. Freeman, Mr. Welles, and Ms. Shockley each filed an affidavit, identical in every aspect, which alleged as follows:

Prior to the vote being taken to expel Plaintiff members, I was aware that the Plaintiff members of the management committee were planning to vote to distribute the remaining cash of the company, approximately $60,000, to the members, including themselves. I did not believe this would be beneficial to the company as it would not allow the company to meet payroll and other financial obligations, without most, if not all, of the members agreeing to loan that money back to the company.

As noted above, the members of FuturePoint met on September 10, 2001, to discuss two distinct offers to purchase ownership units in the company, one from Healthcare Economics Group, LLC, and one from Don Allen, who eventually purchased 499 ownership units. Plaintiff Mr. Atkins filed an affidavit stating in relevant part as follows:

My position on the subject of FuturePoint's cash in the bank had to do with the general offer from Health Care Economics (HCE) to

-9-

purchase interests in the company that was being discussed September 10, 2001, as set forth in paragraph 24 of the Complaint. By the September 10, 2001, members meeting, that HCE offer was for $250.00 per unit and contemplated the FuturePoint members retaining the excess cash on hand of about $63,000.00. Therefore, the HCE offer had a value of $313.00 per unit for anyone who wanted to sell. The offer presented by Mr. Wilder from Don Allen was for $250.00 per unit but was silent on the subject of the excess cash. I then suggested, as a point of discussion, that to make the two offers comparable, <u>if</u> persons were to be authorized by the members to sell their interests to Allen, <u>then</u> perhaps those persons should receive their share of the excess cash. Their investments had earned it, they deserved it, there had never been a previous draw, and since they would be taxed on it, then they ought to have it. This is what I said at the September 10, 2001, members meeting as a point of discussion. As Allen's offer was for 50% of the Company or less, not everyone would be selling, and therefore not all the cash would be drawn. There would be ample cash on hand to operate FuturePoint. The insinuation that I would advocate taking out <u>all</u> the cash to cause FuturePoint to go out of business is absurd.

I requested a management committee meeting for September 12, 2001. On Wednesday September 12, 2001 Defendant Brett Wilder represented to me that he would arrange to pay anyone who wanted to sell the amount of $300 per unit which was comparable to the value of the Allen offer ($313.00 per unit). That same day I spoke to Defendant Tim Welles and Welles confirmed this. In reliance upon these representations, I dropped my insistence on holding a Management Committee meeting that day, and the meeting was agreed to be held the morning of September 14, 2001.

No management committee meeting took place September 14, 2001. As relayed to me after the fact, prior to the scheduled Management Committee meeting, on the morning of Friday September 14, 2001 the Defendants conducted a secret members meeting without notice to me and voted to disband the Management Committee and expel myself and the other Plaintiffs as members from FuturePoint.

Plaintiff Mr. Quade testified by affidavit as follows:

I have first hand knowledge of Brett Wilder's real reason for causing myself and the others to be expelled. In general, that reason was to expel us at a low price and sell the interests taken at a high price. As it specifically pertained to Bill Thompson and I, his reason no doubt

-10-

included the fact that Bill and I would not go along with the plan he presented to us May 31, 2001, to expel certain members and take their interests and sell them at a higher price to one of the offerors at the time. Mr. Wilder even reduced his plan to a spreadsheet, a copy of which is attached as Exhibit A. He had it all figured out. That spreadsheet reflects how we would all gain by expelling 30% of the interests of the company. Those selected for the chopping block by Mr. Wilder were Mike Atkins, Pat Martin, Rhonda Shockley, Dennis Freeman, the Zimmermans, and Melinda Anderson. It was my view that these offers to purchase interests in the company were offers in general, and therefore to the members as a whole, and not just for a few of us to usurp – simply because we knew about the offers and the other members at the time did not. Bill Thompson and I told Mr. Wilder that we would not go along with that scheme, it was not ethical, and that these offers needed to [be] presented to all members for discussion.

It seems that my efforts to do right by my fellow partners in the company got me expelled and without a job at FuturePoint. This was most disappointing, especially to see that Rhonda [Shockley] and Dennis [Freeman] voted to expel me after I had stood up for not expelling them.

Defendant Mr. Wilder testified by deposition regarding the spreadsheet referred to above and his plan to expel certain members of the company as follows:

A: [Mr. Wilder] During the meeting when we discussed the potential expulsion and the guilt by association topics, during that meeting we were brainstorming, all of us, about what would we do, and we realized it was a more complicated thing than we envisioned, expulsion of someone. And we were discussing various scenarios of wait a minute, when you do that, how do you do that in an LLC. I mean, we had an agreement there, we were reading, we were saying well, you know, those shares would have to become the ownership of persons who aren't expelled. This was a worksheet where we were trying to do the math on that, what kind of scenario.
*          *          *
Q: And there's no names on any of these rows, but are you talking about expelling three members with a 10 percent interest?

A: No. As I recall, we were talking about expelling Martin, Atkins and the 10 percent represented by the other small members, smaller shareholders that combined to 10.

-11-

Q: Let's see who those might be.

        \*        \*        \*

Q: Because [Plaintiff] Anderson is three [percent]?

A: Uh-huh.

Q: Zimmermans were four, Freeman and Shockley were three, that adds up to 10?

A: Correct.  During that meeting we were talking about what if this occurred, how would it work.

Q: Tell me about the next line here, says total sale price, $50,000; what is that?  Is that the sale of interests to Mr. Allen?  And are you not saying that we're going to sell 30 percent of the company to Mr. Allen for $50,000?

A: I don't remember that $50,000 figure.  But, I do know that during the meeting as we were discussing this scenario, we knew that at some point we would be selling interests and if we bought–

Q: If you bought low, you could sell high?

A: In this particular situation, that's what this is showing you, yes.

        \*        \*        \*

Q: The first gain would be that if you repurchase 30 percent of the interests, but sell 20 percent of the company, the first gain is a reallocation of membership percentages amongst the remaining members?

A: That's correct.

Q: That's reflected in the final column that says final percentage interest?

A: Correct.

Q: For example, your interest would go up from 20 percent to 22.86 percent?

A: Yes.

The record contains a written offer from Mr. Wilder to Mr. Freeman and Ms. Shockley, dated September 14, 2001, which states in its entirety as follows:

> I do hereby offer to purchase 30 units of your ownership (including financial rights and governing rights) of FuturePoint Administrative Services, LLC for the sum of $10,000.00. This purchase offer is valid for a period of 10 days, with closing of sale to be completed within 10 days of your written acceptance of this offer. This purchase will comply with all terms of the FuturePoint Administrative Services, LLC Operating Agreement. In the event that any member exercises their right to purchase said shares at the agreed price ($4,500.00), I agree to pay you the difference of $5,500.00 within 10 days of said purchase.

Mr. Freeman and Ms. Shockley returned a signed letter of acceptance the same day, September 14, 2001, stating "[w]e accept your offer as written and verbally described to each of us on this date." The same day, the Defendants, who along with the votes of Mr. Freeman and Ms. Shockley controlled 53 percent of the membership units and voting power of the company, voted to expel the Plaintiffs as described above.

The basis for Defendants' argument that they expelled the Plaintiffs in good faith is their assertion that "the Plaintiff members of the management committee were planning to vote to distribute the remaining cash of the company, approximately $60,000, to the members, including themselves." FuturePoint's management committee had the authority and responsibility to distribute the net cash flow of the company to the members. Up until this point, it appears that no cash distributions had been made to any member of the company. The record reflects that after Plaintiffs were expelled, the company made cash distributions to the remaining members in amounts of $13,405.20 on March 27, 2002 and $40,000.00 on April 4, 2002. In their affidavits, Plaintiffs Mr. Quade and Mr. Atkins deny Defendants' allegation that they intended to distribute the remaining cash among the members.

Plaintiffs further argue that Defendants' assertion is false and pretextual for at least two reasons. First, several of the expelled members, Ms. Anderson, Mr. and Mrs. Zimmerman, and Mr. Martin, were not on the management committee and thus had no role in any alleged decision to make a cash distribution. Mr. Quade offered another reason in somewhat colorful fashion in his affidavit:

> The Defendants claim in their affidavits that myself, Mike Atkins, and Bill Thompson, as members of the management committee, were planning to vote to distribute all the remaining cash of the company so as to cause the company to not meet its payroll and other financial obligations. This is just not true. For one thing, I WAS ONE SUCH PAYROLL OBLIGATION. That is, I worked at FuturePoint. The

-13-

> notion that <u>I</u> would vote to ruin my investment and put myself out of a job is nuts!

We find that there exists a genuine issue of material fact regarding whether the Defendants' actions in expelling the minority Plaintiffs were taken in good faith, as required by the LLC Act, or whether they expelled Plaintiffs solely in order to force the acquisition of their membership units at a price of $150.00 in order to sell them at $250.00 per unit, in violation of their fiduciary duty.

In addition, there is a legitimate issue raised as to whether the sale of Mr. Freeman and Ms. Shockley's ownership units to Mr. Wilder violated the operating agreement, as alleged by Plaintiffs. The operating agreement contains the following provision regarding the transfer of financial rights in the company:

> 13.3 <u>Voluntary Lifetime Transfers</u>. No Member may make a Voluntary Lifetime Transfer of Financial Rights except pursuant to this Section. Any Member who wishes to make said Voluntary Lifetime Transfer must promptly send a notice to each other Member. Such notice shall include a description of the proposed Transfer, the price and terms on which the Financial Rights are to be Transferred, the name, address and business or occupation of the proposed transferee, and any other facts that are, or would reasonably be deemed to be, material to the proposed Transfer. The Member wishing to make a Voluntary Lifetime Transfer shall be deemed to have offered to sell his or her Financial Rights otherwise to be transferred to the other Members. The other Members shall have the option to buy the Offered Financial Rights at either (a) the price and terms set forth in the notice of proposed Transfer or (b) at the Agreed Price and on the Agreed Terms. Each other Member shall have sixty (60) days from such notice in which to elect to buy all or any portion of the Offered Financial Rights. The other Members may elect to buy the Offered Financial Rights in proportion to their respective Financial Rights (excluding the Offered Financial Rights), or in such other proportion as they may agree.

It is not clear from the record whether Plaintiffs were given any opportunity to purchase the membership units and financial rights of Mr. Freeman and Ms. Shockley. There is nothing in the record to suggest that they were offered this opportunity, and Plaintiffs' brief argues that they were not. There thus exists an issue of whether the sale of Mr. Freeman and Ms. Shockley's financial rights to Mr. Wilder comported with the terms of the operating agreement.

Finally, it is not entirely clear from the record exactly who paid the $10,000.00 to Mr. Freeman and Ms. Shockley. Mr. Wilder testified as follows in his deposition:

> Q: Were the Freemans and the Shockleys [sic] paid with a FuturePoint check?
>
> A: I believe so, but I'm not certain.

If the purchase price of the 30 units owned by Mr. Freeman and Ms. Shockley was paid by Mr. Wilder out of company funds, it would not only be a potential violation of Mr. Wilder's duty to the minority shareholders, but also a potential violation of his duty to the LLC itself. In addition to the fact that the $333.33 per unit paid to Mr. Freeman and Ms. Shockley arguably was more than market value, the transaction itself was one which would quite foreseeably embroil the company and its members in litigation. The question of the source of the purchase price of Mr. Freeman and Ms. Shockley's ownership units is to be determined by the trier of fact on remand.

For the foregoing reasons, we find there are questions of material fact regarding whether the Defendant's actions in expelling the minority Plaintiffs were taken in good faith and in accordance with their fiduciary duty to them. The Trial Court's grant of summary judgment is vacated, and the cause remanded for proceedings consistent with this opinion. Costs on appeal are adjudged against the Appellees Brett Wilder, Michael E. Cox, Lamarr Stout, Timothy Welles, Dennis Freeman, and Rhonda Shockley.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE